# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

    No. 97-3337

ROBERT SALZANO,

    Defendant-Appellant.

ORDER AMENDING OPINION
Filed October 16, 1998

Before **EBEL, HENRY,** and **BRISCOE,** Circuit Judges.

On July 28, 1998, this court issued its opinion in the above-entitled case. A majority of the panel now orders that the opinion be modified in the following way:

The sentence found at lines 7 and 8 on page 15 is deleted:

    "However, an aggregation of individual null factors will almost always amount to a null set."

In its place, the following material is added:

    "Of course, it is correct that the individual factors must be considered in the aggregate and in the context of the totality of the

circumstances.  However, as so considered, we conclude that Trooper Guerrero did not possess a reasonable suspicion of criminal activity."

Judge Briscoe continues to adhere to her dissent issued in this case.

The opinion, as modified, is reissued.

Entered for the Court
PATRICK FISHER, Clerk of Court

By:

Amy Frazier
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 16 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

ROBERT SALZANO,

      Defendant-Appellant.

No. 97-3337

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 97-40002-01-DES)**

James J. Warner, San Diego, California, for Defendant-Appellant Robert Salzano.

James E. Flory, Assistant United States Attorney, Topeka, Kansas (Jackie N. Williams, United States Attorney with him on the brief) for Plaintiff-Appellee United States.

Before **EBEL, HENRY** and **BRISCOE**, Circuit Judges.

**EBEL**, Circuit Judge.

Defendant-Appellant Robert Salzano ("Mr. Salzano") appeals the district court's denial of his Motion to Suppress Evidence. Because the district court

erred in refusing to grant Mr. Salzano's motion, we reverse the district court's ruling and remand the case with instructions that the evidence be suppressed.

## Background

On December 20, 1996, Kansas Highway Patrol Trooper John Guerrero ("Trooper Guerrero") stopped Mr. Salzano, who was driving a motor home along I-70, for straying onto the shoulder. Trooper Guerrero suspected that Mr. Salzano might be falling asleep or intoxicated. At the stop, Mr. Salzano produced a valid driver's license. Trooper Guerrero asked Mr. Salzano if the vehicle belonged to him; when Mr. Salzano indicated that the motor home was rented, Trooper Guerrero asked to see the rental agreement. Mr. Salzano invited Trooper Guerrero into the vehicle while Mr. Salzano searched for the rental agreement. Upon entering the vehicle Trooper Guerrero noticed the smell of evergreen, which he attributed to the presence of a natural evergreen wreath hanging in the vehicle. He also noticed the smell of a dog that was traveling with Mr. Salzano. As Mr. Salzano handed him the rental papers, Trooper Guerrero noticed that Mr. Salzano "seemed a little nervous. His hands were shaking as he handed [Trooper Guerrero] the paper."

In response to Trooper Guerrero's questions as to his travel plans, Mr. Salzano indicated that he was on vacation and was driving from San Diego,

California, to Springfield, Massachusetts, to visit his father. In response to Trooper Guerrero's questions about the relative expense of renting a motor home to drive across country, compared to flying or renting a smaller vehicle, Mr. Salzano replied that he planned to drive his father back to California and that they might visit some friends in South Dakota. Trooper Guerrero noted that the rental papers handed him by Mr. Salzano indicated that a party of three would be traveling in the motor home, but Mr. Salzano was traveling alone. Trooper Guerrero did not question Mr. Salzano about this. Mr. Salzano indicated to Trooper Guerrero that he was married; Trooper Guerrero asked Mr. Salzano why he was traveling without his wife, to which Mr. Salzano replied that she could not get time off from work.

Trooper Guerrero performed a number of intoxication tests on Mr. Salzano, all of which were negative. Trooper Guerrero returned Mr. Salzano's paperwork and issued him a verbal warning about the hazards of driving while sleepy. He then asked if he could search the vehicle for drugs. Mr. Salzano refused to consent to the search. Trooper Guerrero called for a drug dog team, which arrived on the scene approximately 27 minutes later. When the drug dog alerted, officers searched the vehicle and found approximately 494 pounds of marijuana.

Mr. Salzano was indicted for possession with intent to distribute more than 100 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1). He moved to

suppress the seized evidence on the basis that it was obtained as the result of an unlawful seizure. The district court, without making any factual findings, denied the motion. Mr. Salzano then entered into a conditional guilty plea, reserving the right to appeal the district court's denial of his motion to suppress. Because the district court erred in refusing to grant Mr. Salzano's motion to suppress, we reverse the denial of his motion and remand for further proceedings.

## Discussion

An investigative stop that was neither consensual nor the result of probable cause must fulfill two requirements: (1) the stop must be "'justified at its inception,'" and (2) the resulting detention must be "'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Shareef, 100 F.3d 1491, 1500-01 (10th Cir. 1996) (quoting Terry v. Ohio 392 U.S. 1, 20 (1968)). In the absence of probable cause or a warrant, the officer must have "an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring" in order to justify detaining an individual for a period of time longer than that necessary to review a driver's license and vehicle registration, run a computer check, determine that the driver is authorized to operate the vehicle, and issue the detainee a citation. United States v. McRae, 81 F.3d 1528, 1534 (10th Cir. 1996) (quoting United States v. Bonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994)). We view the evidence in the light most

favorable to the government, and review the district court's factual findings for clear error, but we review de novo the district court's conclusion that the officers had reasonable, articulable suspicion of criminal activity at the time of the seizure. See United States v. Carhee, 27 F.3d 1493, 1496-97 (10th Cir. 1994) (citations omitted). The government bears the burden of proving the reasonableness of the officers' suspicion. See id. at 1496 & n.2 ("The government . . . bears the burden of proving that its warrantless actions were justified."); United States v. Finefrock, 668 F.2d 1168, 1170 (10th Cir. 1982) ("Whenever a defendant challenges a warrantless search or seizure, the government carries the burden of justifying the agent's actions.") (citing Chimel v. California, 395 U.S. 752, 762 (1969)); see also United States v. Longmire, 761 F.2d 411, 418 (7th Cir. 1985) ("[T]he government bore the burden of establishing by a preponderance of the evidence . . . that Officer Pacheco had a reasonable suspicion justifying the seizure of Longmire and her companion.").

Mr. Salzano does not contest the justification for the stop. Rather, Mr. Salzano claims that once Trooper Guerrero terminated the traffic stop by handing Mr. Salzano his paperwork, Trooper Guerrero lacked a reasonable suspicion of criminal activity necessary to justify detaining him further. We must review the factors enumerated by Trooper Guerrero, both individually and in the aggregate, and determine whether, under the totality of the circumstances, those factors give

- 5 -

rise to a reasonable suspicion of criminal activity.  See United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997).  In doing so, we give deference to "a law enforcement officer's ability to distinguish between innocent and suspicious actions," but keep in mind that "[i]nchoate suspicions and unparticularized hunches . . . do not provide reasonable suspicion."  Id.  Moreover, as we have held, "[e]ven though reasonable suspicion may be founded upon factors consistent with innocent travel, . . . '[s]ome facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous.'"  Id. (quoting United States v. Lee, 73 F.3d 1034, 1039 (10th Cir. 1996)).

At the suppression hearing, the government relied upon the following factors as support for the reasonableness of Trooper Guerrero's suspicion that criminal activity was afoot: (1) Mr. Salzano's uneconomical decision to travel across the country in an expensive motor home at a rental cost of $3,900 and a fuel cost of approximately $1,000; (2) the discrepancy between the number of persons stated on the rental agreement and the fact that Mr. Salzano was traveling alone; (3) the size of the motor home and the knowledge that such motor homes are often used to haul large quantities of drugs; (4) Mr. Salzano's visible nervousness while handing Trooper Guerrero the rental papers; (5) the smell of evergreen in the vehicle; and (6) Mr. Salzano's statement that he had come from California.  We analyze each of these factors separately, and then look at them in

- 6 -

the aggregate to determine whether they support a reasonable suspicion of criminal activity.

First, this court held in <u>Wood</u> that the decision to take the time and expense to drive, rather than fly or use some other mode of transportation, cannot support a reasonable suspicion of criminal activity, even when it would seem to make more sense financially to choose an alternative form of transportation and even when the defendant states that he is not currently employed. "There is nothing criminal about traveling by car to view scenery. . . . Moreover, temporary unemployment does not mean that vacations are financially unattainable. [The defendant] may have saved money for the trip; he may have been the donee of a wealthy relative or acquaintance; he might have won the lottery or not yet exceeded the credit line on his VISA card." <u>Wood</u>, 106 F.3d at 947. Simply because the officer would not have chosen a particular vehicle for travel does not make that choice indicative of criminal activity.

Here, Mr. Salzano indicated to Trooper Guerrero that he had taken vacation time and had chosen to drive across the country to visit his father and potentially bring him back to California. Mr. Salzano also said that he had plans to stop off in South Dakota on the way back to visit friends. In addition to the possibilities forwarded by this court in <u>Wood</u>, perhaps Mr. Salzano saved his money and vacation time just for this trip; his father may have preferred to drive rather than

to fly; indeed, Mr. Salzano's father may have promised to help share the expenses generated by the rental and fueling of the motor home. Moreover, Mr. Salzano may have chosen to travel by motor home in order to save on lodging costs, to avoid the hassles of finding accommodations that accept large pets such as his dog, and to enable him and his father to visit relatively out-of-the-way locales where temporary lodging is not readily available.

The government asks us to rely upon a decision by the Eighth Circuit, United States v. Pollington, 98 F.3d 341, 343 (8th Cir. 1996). In that case, the court held, with almost no discussion, that the detaining officer's disbelief that the defendant had borrowed a "gas-guzzling" motor home just to take a weekend trip from Michigan to Las Vegas, coupled with a strong smell of detergent and unusual nervousness, supported the officer's reasonable suspicion that the defendant was transporting drugs. See id. We find that case sufficiently distinguishable on its facts that we do not regard it as persuasive authority in this case.

Similarly, the government's assertion that large motor homes have been used by drug runners to haul large quantities of drugs does not support a reasonable suspicion that this individual might be so engaged.[1] Large quantities

---

[1] The government quotes the Supreme Court in California v. Carney, 471 U.S. 386, 394 (1985), in which the Court said that "a motor home lends itself
(continued...)

- 8 -

of drugs can be, and have been, hauled in vans, U-Haul trucks, tractor trailers, indeed any large vehicle. The mere fact that a vehicle has a large capacity cannot be sufficient to support a reasonable suspicion of criminal activity. See United States v. Robert L., 874 F.2d 701, 704-05 (9th Cir. 1989) (absent evidence that car was specially modified to carry large quantities of drugs, that it was heavily loaded, or that the vehicle was "of a particular make or model that has been expressly linked to drug trafficking," the mere fact that defendant was driving a car with large trunk capacity was not sufficient to support reasonable suspicion); cf. United States v. Gordon, 722 F.2d 112, 114 (5th Cir. 1983) (per curiam) (use of motor home, inter alia, sufficient to support reasonable suspicion of drug trafficking where detainee was identified as member of organization known for using motor homes in drug smuggling operations). Trooper Guerrero did not testify that the motor home seemed overloaded or that the vehicle had been modified in any way to suggest the addition of false panels or the like. Cf. United States v. Kohler, 836 F.2d 885, 888 (5th Cir. 1988) (finding reasonable suspicion to stop a heavily loaded motor home near the U.S.- Mexican border

---

[1](...continued)
easily to use as an instrument of illicit drug traffic and other illegal activity." However, the quoted language appears in a discussion of whether a motor home qualified as a vehicle or a dwelling, for purposes of the vehicle exception to the Fourth Amendment, and not whether the choice to drive a motor home could serve as a basis for reasonable suspicion of criminal activity.

after park rangers had observed marked changes in the appearance of the motor home). Nor did the government present any evidence that a motor home such as the one driven by Mr. Salzano is a mode of transportation preferred by drug smugglers. The fact that smugglers transporting large quantities of narcotics prefer to do so in large vehicles does not suffice to support reasonable suspicion that a large recreational vehicle may have been engaged in such traffic.[2]

The government next points to the fact that the rental agreement produced by Mr. Salzano indicated that three persons would be traveling in the motor home, but that Mr. Salzano, when stopped, was traveling alone. The notation of three persons on the rental agreement is consistent with Mr. Salzano's stated travel plans. He told Trooper Guerrero that he was traveling to Massachusetts for the purpose of possibly bringing his father back with him to California, and then stopping off to visit some friends in South Dakota on the way back. It is possible that when he rented the motor home, Mr. Salzano envisioned that the vehicle would eventually be occupied by three persons: himself, his father, and a South Dakotan friend. In the alternative, perhaps Mr. Salzano had planned to drive to Massachusetts with his wife, in which case his father would be the third person.

---

[2] Indeed, on cross examination, Trooper Guerrero admitted that the mere size of the vehicle in and of itself did not seem unusual to him, but rather it was the fact that Mr. Salzano was traveling alone in such a large vehicle that made him suspicious.

Trooper Guerrero only knew that Mr. Salzano's wife was not traveling with him because she could not get the time off from work. Perhaps her vacation was canceled at the last moment or perhaps she was planning on flying out to Massachusetts to join Mr. Salzano and his father for the trip back. Whatever the case, the discrepancy between the stated number of occupants on the motor home rental agreement and the actual number occupying the vehicle at the time of the stop can readily be explained and is "so innocent or susceptible to varying interpretations as to be innocuous"; as with the preceding two facts, it must be dismissed. See Wood, 106 F.3d at 946.

As for Mr. Salzano's apparent nervousness when handing over the rental agreement, we have "repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on . . . nervousness . . . 'must be treated with caution.'" United States v. Fernandez, 18 F.3d 874, 879 (10th Cir. 1994) (quoting United States v. Millan-Diaz, 975 F.2d 720, 722 (10th Cir. 1992)). Nervousness alone cannot support reasonable suspicion of criminal activity. See id. at 880. This is because it is common for most people "to exhibit signs of nervousness when confronted by a law enforcement officer" whether or not the person is currently engaged in criminal activity. Wood, 106 F.3d at 948. Thus, absent signs of nervousness beyond the

norm, we will discount the detaining officer's reliance on the detainee's nervousness as a basis for reasonable suspicion. See id.

The government did not show that Mr. Salzano exhibited signs of nervousness beyond those normally anticipated during a citizen-police encounter. Trooper Guerrero testified that Mr. Salzano's hands were shaking more than the Trooper usually sees during traffic stops, but we must discount that evidence due to the fact that Trooper Guerrero did not know Mr. Salzano, thus he had no basis upon which to contrast Mr. Salzano's "behavior during the traffic stop with his usual demeanor." Id. Moreover, after noting the shaking of Mr. Salzano's hand, Trooper Guerrero interacted at some length with Mr. Salzano, having a chance to observe Mr. Salzano close up as he as he administered the intoxication tests and questioned Mr. Salzano about his travel plans. It is significant that despite this rather lengthy interaction, including some amount of questioning in the patrol car, Trooper Guerrero testified that the *only* sign of nervousness exhibited by Mr. Salzano was a shaking of the hands as he handed Trooper Guerrero the rental papers, behavior that made Mr. Salzano appear, in Trooper Guerrero's words, "a little nervous." On this record, Trooper Guerrero's claim that Mr. Salzano's nervousness provided him reasonable suspicion of criminal activity must be discounted.

As for the smell of evergreen noted by Trooper Guerrero, we agree with the government's assertion that a strong odor may give rise to reasonable suspicion on the part of law enforcement officials that the odor is being used to mask the smell of drugs. See, e.g. United States v. Villa-Chaparro, 115 F.3d 797, 802 (10th Cir. 1997) (strong smell of detergent and presence of detergent crystals visible on vehicle floorboard, inter alia, supported reasonable suspicion of presence of drugs in vehicle); United States v. Hernandez-Rodriguez, 57 F.3d 895, 898 (10th Cir. 1995) (strong smell of perfume supported reasonable suspicion that odor was employed to mask smell of drugs); United States v. Stone, 866 F.2d 359, 362 (10th Cir. 1989) (strong smell of patchouli oil, which officer knew was often used by drug smugglers to mask scent of marijuana, supported reasonable suspicion of drug possession). However, Trooper Guerrero neither testified that at the time of the stop he was aware that drug smugglers often used the scent of natural evergreen to cover the smell of illegal drugs nor that the evergreen smell was out of proportion to that one might expect to be emitted by a large fresh-cut natural evergreen wreath.[3] What's more, this stop took place only

---

[3] Upon searching the motor home, officers found that evergreen boughs had been placed on top of the marijuana, ostensibly in an effort to mask the smell. However, because Trooper Guerrero did not indicate that the smell of evergreen was incongruent with the presence of the wreath in the vehicle, the presence of evergreen with the contraband, which was only discovered as a result of the search, does not support Trooper Guerrero's claim of reasonable suspicion.

five days before Christmas. Absent any evidence that drug smugglers commonly use fresh evergreen wreaths to mask the scent of drugs, or that the evergreen smell encountered by Trooper Guerrero was stronger than to be expected given the size of the wreath displayed in Mr. Salzano's vehicle, the presence of a Christmas wreath in a vehicle a few days before Christmas is exactly the sort of fact that "must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." Wood, 106 F.3d at 946.

Finally, the government argues that Trooper Guerrero was reasonable in suspecting that Mr. Salzano was transporting drugs because he told Trooper Guerrero that he had come from California. Trooper Guerrero testified that his suspicions were aroused at the time of the stop because "California . . . [is] a source state for narcotics." However, the government offered no evidence to support the assertion that vehicles coming from California are any more likely to contain drugs than those coming from Texas, Arizona, New Mexico, or any other western state. As we suggested in Wood, the mere fact that one hails from a state known for drug trafficking is not sufficient to support reasonable suspicion unless the detainee is attempting to conceal the fact that he had come from a drug source area. See id. at 947. Mr. Salzano did not attempt to conceal the fact that he came from California, nor did he give inconsistent statements as to which city he started in, where he was going, or what the purpose was of his trip. So long as

the detainee provides a consistent statement from whence he came, the mere fact that he comes from California, or even San Diego, is not a reasonable basis to suspect that he is carrying drugs or other contraband.

At oral argument, the government strenuously reminded this court that in reviewing a law official's justification for suspicion of criminal activity we must review the factors relied upon by the officer both individually and in the aggregate. Of course, it is correct that the individual factors must be considered in the aggregate and in the context of the totality of the circumstances. However, as so considered, we conclude that Trooper Guerrero did not possess a reasonable suspicion of criminal activity. See Id. ("Although the nature of the totality of the circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'") (quoting Karnes v. Skrutski, 62 F.3d 485, 496 (3d Cir. 1995)). Because in this case the government failed to meet its burden of proving by a preponderance of the evidence that Trooper Guerrero's suspicion of criminal activity was reasonable, we find that the seizure of Mr. Salzano beyond the initial traffic stop was illegal. Thus, the evidence obtained as

a result of that seizure must be suppressed.[4]  See id. (citing <u>Wong Sun v. United States</u>, 371 U.S. 471, 484-86 (1963)).

## Conclusion

For the reasons stated above, the district court's denial of Mr. Salzano's motion to suppress the seized evidence is REVERSED and the case REMANDED for further proceedings not inconsistent with this decision.

---

[4] Because we so conclude, we need not address the issues regarding sentencing raised by Mr. Salzano on appeal.

No. 97-3337, United States v. Salzano

BRISCOE, Circuit Judge, dissenting:

I respectfully dissent. In my view, Trooper Guerrero had reasonable articulable suspicion which justified his detention of Salzano. I would affirm Salzano's conviction, but remand for further factfinding on the "safety valve" issue he raises.

In an appeal from the district court's denial of a motion to suppress, findings of historical fact are reviewed only for clear error, but whether the historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion is a question of law subject to de novo review on appeal. Ornelas v. United States, 517 U.S. 690, 696-97 (1996). While the government bears the burden of showing the detention was reasonable, United States v. Carhee, 27 F.3d 1493, 1496-97 (10th Cir. 1994), on appeal, we consider the totality of the circumstances and view the evidence in the light most favorable to the government. United States v. Villa-Chaparro, 115 F.3d 797, 800-01 (10th Cir.), cert. denied 118 S. Ct. 326 (1997).

An investigative detention short of full arrest must be supported by reasonable articulable suspicion -- a particularized and objective basis for suspecting the person stopped of criminal activity. United States v. Cortez, 449 U.S. 411, 417-18 (1981). An inchoate and unparticularized suspicion or hunch is insufficient. The Fourth Amendment requires some minimal level of objective

justification for the detention. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence, and less than the fair probability that contraband or evidence of a crime will be found that is required for probable cause. United States v. Sokolow, 490 U.S. 1, 7 (1989).

In evaluating the validity of an investigative detention, the courts must consider "the totality of the circumstances--the whole picture." Id. at 8. A minimum number of factors is not required nor are there any outcome determinative criteria, as such an approach would be antithetical to the totality of the circumstances inquiry. United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994).

Wholly lawful conduct may justify suspicion of criminal activity. Factors which are not by themselves proof of illegal conduct and are consistent with innocent travel may, taken together, amount to reasonable suspicion. Sokolow, 490 U.S. at 9-10. In making a determination of reasonable suspicion, "our task . . . is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious. Rather, the reasonable suspicion calculus turns on whether the specific articulable facts, viewed together through the lens of a reasonable law enforcement officer, justified a brief roadside detention." United States v. Doyle, 129 F.3d 1372, 1376 (10th Cir. 1997).

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same--and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

Cortez, 449 U.S. at 418. Trained officers aware of the modes and patterns of operation of certain kinds of lawbreakers can draw inferences and make deductions that might well elude untrained persons. Id.

The majority relies on United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997), and United States v. Lee, 73 F.3d 1034, 1039 (10th Cir. 1996), to individually discard each factor and then conclude no factors remain to support reasonable suspicion. In Wood and Lee, the court found some factors relied on by police must be dismissed outright as so innocent or so susceptible to varying interpretations as to be innocuous. Here, the majority departs from the totality of the circumstances approach mandated by the Supreme Court by applying Wood and Lee as authority to review each factor individually and then discount each one as having a potentially innocent or innocuous explanation.

By the very nature of the question presented, all factors relied on to establish reasonable suspicion are *ambiguous* and consistent with either innocent or criminal activity. Factors such as masking odors, implausible and inconsistent travel plans, and nervousness are all inherently ambiguous and could be consistent

- 3 -

with either innocence or with transportation of drugs. Masking odors are chosen because they could have an innocent explanation such as the spilling of laundry detergent. There also could be innocent explanations for implausible and inconsistent travel plans. If a factor offered to support reasonable suspicion is *not* ambiguous, such as an officer directly seeing or smelling drugs, the factor would support a finding of probable cause and reasonable suspicion would no longer be the question. See, e.g., United States v. Nielsen, 9 F.3d 1487, 1489-91 (10th Cir. 1993); United States v. Morin, 949 F.2d 297, 299-300 (10th Cir. 1991); United States v. Bowman, 487 F.2d 1229, 1241 (10th Cir. 1973).

We must be cautious in applying Wood and Lee and reject only those factors that are wholly innocent and those that do not suggest criminal activity at all, such as the fast food wrappers and maps in Wood. If a factor can be discounted simply because we can supply an innocent explanation for it, there would never be reasonable suspicion because all factors (short of those which would supply probable cause) can be discounted.

I question whether nervousness can be rejected outright. While nervousness is so common among persons stopped for traffic violations that it does not provide significant support for suspicion of more serious criminal activity, we have recognized nervousness as one of the totality of circumstances that can provide some support for reasonable suspicion. See, e.g., United States

- 4 -

v. Soto-Cervantes, 138 F.3d 1319, 1324 (10th Cir. 1998), petition for cert.filed (June 10, 1998); United States v. Hunnicutt, 135 F.3d 1345, 1350 (10th Cir. 1998); United States v. Soto, 988 F.2d 1548, 1556 (10th Cir. 1993).

The majority totally discounts Salzano's nervousness because Trooper Guerrero had no prior acquaintance with him. While we have suggested in several cases that officers' generic claims of nervousness are of little weight where the officer does not know the stopped driver, see Wood, 106 F.3d at 948; United States v. Bloom, 975 F.2d 1447, 1458 (10th Cir. 1992), overruled on other grounds United States v. Little, 18 F.3d 1499, 1504 (10th Cir. 1994); United States v. Hall, 978 F.2d 616, 621 (10th Cir. 1992), in numerous cases we have considered nervousness as a factor supporting reasonable suspicion without noting whether the officer knew the stopped driver or not. See, e.g., Soto-Cervantes, 138 F.3d at 1324; Hunnicutt, 135 F.3d at 1350; Soto, 988 F.2d at 1556. To totally discount an officer's observations of behavior of a stopped driver that is consistent with nervousness because the officer had no prior acquaintance with the driver defies commonsense and practical experience. It is highly unlikely that an officer conducting a traffic stop will know the stopped driver, but officers can compare an individual's behavior with the behavior of others they have observed. Although Trooper Guerrero acknowledged it was not unusual for people stopped for traffic violations to appear nervous, he said the shakiness he observed in

Salzano was unusual. I would not discount Salzano's nervousness outright, but would consider it as a part of the totality of circumstances that can provide some support for reasonable suspicion.

Further, Salzano's implausible travel plans were neither innocuous nor insignificant. The rental agreement showed the rent for the R.V. was $3,900 and Salzano told the officer the R.V. got 6.7 miles per gallon. While there could be many innocent explanations for the use of such an expensive means for one person to travel across the United States, it was so unusual that it is a legitimate factor supporting suspicion of drug trafficking. Cf. Sokolow, 490 U.S. at 8-9. Moreover, the inconsistency between the notation on the rental agreement of a party of three and the fact that Salzano was traveling alone was a legitimate consideration. The majority finds it significant that the R.V. was not riding low; however, one obvious reason for renting a large vehicle to transport drugs is a large vehicle can carry heavier loads without riding low.

I would also conclude the evergreen odor cannot be discounted outright. While the use of pine or evergreen as a masking odor was new to the officer, he was aware drug couriers use a variety of masking agents. See Villa-Chaparro, 115 F.3d at 801 (laundry detergent); United States v. Christian, 43 F.3d 527, 530 (10th Cir. 1994) (freshly-lit cigarette); United States v. Sanchez-Valderuten, 11 F.3d 985, 989 (10th Cir. 1993) (coffee and air freshener); United States v. Stone,

866 F.2d 359, 362 (10th Cir. 1989) (patchouli oil). We have repeatedly recognized that air fresheners are often used as masking agents and it is common knowledge that air fresheners are frequently pine or evergreen scented. One of the most common automobile air fresheners is in the shape of a pine tree. See Car-Freshener Corp. v. S.C. Johnson & Son, Inc., 70 F.3d 267 (2d Cir. 1995). In light of the variety of masking agents used in the drug trade, it was not unreasonable for the officer to believe the pine or evergreen scent could be a masking odor intended to hide the odor of drugs. We must give deference to the officer's ability to draw inferences and make judgments that might elude an untrained person. Cortez, 449 U.S. at 418. Nor should we discount the evergreen odor as a factor outright merely because a fresh evergreen wreath displayed during the Christmas season is the apparent source of the odor. Masking odors provide support for reasonable suspicion even when their source is visible, see Villa-Chaparro, 115 F.3d at 802; Christian, 43 F.3d at 530, regardless of whether the odor is appropriate or inappropriate for the season.

The evergreen odor, combined with Salzano's nervousness and his use of an unusually expensive means for one person to travel across the United States in the winter, were sufficient to establish reasonable suspicion that he was transporting drugs. Cf. United States v. Mendez, 118 F.3d 1426, 1431-32 (10th Cir. 1997) (contradictory, implausible travel plans, crooked dashboard face plate,

and dismounted radio, suggesting possible hidden compartment, held sufficient); Sanchez-Valderuten, 11 F.3d at 989 (unlikely route, masking odors, and evasion of officer's questions held sufficient); Stone, 866 F.2d at 362 (masking odor and DEA computer indication that defendant was suspected of involvement in drug trafficking held sufficient).  I would affirm the district court's ruling that Salzano's detention was supported by reasonable suspicion.

As a consequence of concluding Salzano's detention was supported by reasonable suspicion, I would address Salzano's sentencing issues and conclude only his "safety valve" issue has merit and remand for further factfinding and potential resentencing.

Salzano contends he was entitled to a reduced sentence under the "safety valve" provision of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2.  Under the "safety valve" provision, the statutory minimum sentence for certain drug crimes is inapplicable if the court finds the defendant has a minimal criminal history, did not use or threaten violence, possess a dangerous weapon, cause death or serious bodily injury, was not a leader, organizer, or supervisor of others in the offense, was not engaged in a continuing criminal enterprise, and "not later than the time of the sentencing hearing . . . had truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." §

5C1.2. The government agreed Salzano met all but the last requirement. It did not believe he told everything he knew about the crime. In particular, the government was skeptical about Salzano's professed ignorance about the intended recipients of the drugs. It was also skeptical of his professed ignorance of any specific identifying information about the source of the drugs other than their fairly common names and general descriptions. The government found Salzano's professed ignorance implausible in light of his age, education, and business experience. However, because the government lacked hard evidence of nondisclosure, it offered to consider a report from a reputable polygraph examiner, something it usually would not do. Salzano did not provide a polygraph report before sentencing.

A defendant bears the burden of proving the applicability of the safety valve provision by a preponderance of the evidence. United States v. Verners, 103 F.3d 108, 110 (10th Cir. 1996). The district court's decision is reviewed only for clear error. United States v. Roman-Zarate, 115 F.3d 778, 784 (10th Cir. 1997).

Salzano presented expert evidence that it is likely a courier would not know the drug recipient's identity and would not necessarily know in advance the details of the delivery. Couriers are told only what they need to know. Typically, a courier is told to drive to a specific location and to wait, or the courier is given

a phone number to call upon arrival at a destination city for instructions. Lack of evidence of phone calls to the east coast indicates Salzano did not know the recipients, and lack of evidence of unexplained wealth or prior involvement in drug distribution indicated Salzano was a mere courier with no ownership interest in the drugs.

The government took the position that Salzano's statement at his presentence debriefing that he did not know the recipients was inconsistent with statements made to the officers on the day of his arrest. In the only specific finding of fact on the issue, the district court agreed. However, Salzano did not make inconsistent statements. His statements to the officers on the day of his arrest show only he knew enough about the recipients to be afraid they would kill him or his family if they learned he cooperated. He may have been warned by the source or may have simply made a reasonable assumption. Nor do his statements that he would carry out a controlled delivery if he got a "real good deal" from the government show he knew the recipients because it is common for couriers not to know the identities of recipients.

Because the only finding of fact supporting the conclusion that Salzano did not disclose everything he knew about the crime was clearly erroneous, I would remand for further factfinding on the question of whether the safety valve provision of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2 applies in this case.