**UNITED STATES of America,
Plaintiff,**

v.

**Kenneth SLATER and Octavio
Rojas Silos, Defendants.**

No. 2:04 CR 00471 W.

United States District Court,
D. Utah,
Central Division.

Jan. 10, 2005.

Vernon G. Stejskal, Esq., Drug Enforcement Administration, Metropolitan Narcotics Task Force, Salt Lake City, UT, for Plaintiff.

Kenneth Edward Slater, Vanessa M. Ramos–Smith, Esq., Utah Federal Defender Office, Salt Lake City, UT, for Defendants.

### MEMORANDUM DECISION AND OR-
### DER DENYING DEFENDANTS'
### MOTION TO SUPPRESS

WINDER, Senior District Judge.

This matter is before the court on Defendants' Motion to Suppress. On October 18, 2004, the court conducted an evidentiary hearing on the motion. Defendant Kenneth Slater ("Slater") was present with his counsel, Vanessa M. Ramos. Defendant Octavio Rojas Silos ("Silos") was present with his counsel, Robert Breeze. The government was represented by Vernon G. Stejskal. Following the hearing, the court ordered a transcript as well as supplemental briefing from the parties. After thorough review and consideration of the pleadings submitted by the parties and the testimony presented at the evidentiary hearing on the motion to suppress, the court enters the following memorandum decision and order.

### BACKGROUND

The court finds the relevant facts as follows.[1] On July 12, 2004, Utah Highway Patrol Trooper Steve Salas was monitoring traffic from his patrol car, located in the median on Interstate 70, approximately two miles west of Green River, Utah. (Tr. at 6.) While sitting in the median, at approximately 10:00 a.m., Trooper Salas observed a white Ford pickup truck traveling eastbound on I-70. As the truck passed, Salas noticed a crack in the passenger side of the windshield. (Tr. at 7.) Trooper Salas exited the median and attempted to get behind the pickup truck. While trying to catch up with the vehicle, Trooper Salas observed the vehicle move from the right to the left travel lane without signaling. Salas continued to watch as the vehicle traveled a short distance and then moved back from the left to the right travel lane. During this second lane change, the pickup truck signaled, but failed to signal for three seconds. (Tr. at 7–8.) Utah law requires that a vehicle signal for three seconds before making a lane change. (Tr. at 8.) Based on these observations, Trooper Salas stopped the vehicle. (Tr. at 9.)

Trooper Salas approached the vehicle on the passenger side and made contact with the vehicle's two occupants.[2] Trooper Salas asked the driver for his driver's license. The driver stated that he had a license, but did not have it with him at the time. (Tr. at 10.) The driver said that he had no identification because he left his wallet in Iowa. (Tr. at 10; Pl's Ex. 1 at 10003.) Trooper Salas then asked for the vehicle's registration, which the driver provided. Trooper Salas' review of the registration revealed that the pickup was not registered to either of the vehicle's occupants, but was registered to Jesus Olivas out of Iowa. (Tr. at 10.) Trooper Salas explained the reasons he stopped the vehicle. Trooper Salas referred to the crack in the windshield as well as both of the improper lane changes. (Pl's Ex. 1 at 10042.)

As Trooper Salas was engaging in this initial conversation with the driver, his attention was drawn to the area of the passenger-side air bag. Trooper Salas noticed that the cover for the passenger air bag had been tampered with and was secured to the dash with dry wall screws. (Tr. at 11.) Trooper Salas testified that he found the air-bag cover significant because he had prior experience with a Ford F–150 pickup wherein the pickup had a secret compartment built in the "fire wall" and access to the compartment was located

---

1. Reference to the transcript of the evidentiary hearing conducted on October 18, 2004, will be cited as "Tr. at ___."

2. The events of the traffic stop were recorded on the video camera in Trooper Salas' patrol car. The video recording was introduced into evidence as Pl's Ex. 1.

behind the passenger side air bag. (Tr. at 11.) Trooper Salas also observed that the bed of the pickup contained only one small travel bag for the two passengers. (Tr. at 10.)

After making these observations, Trooper Salas asked the driver to come back to his patrol car. (Tr. at 11.) Trooper Salas said to the driver, "let me have you step back to my vehicle, Sir, since you don't have your license, and I'll get your information from you, okay?" (Pl's Ex. 1 at 10078.) The driver exited the vehicle and sat down in the front passenger seat of the patrol car. Trooper Salas then began drafting a "Warning" on his lap top computer.

Trooper Salas asked the driver who owned the vehicle. The driver stated that it belonged to his brother-in-law, whose name was Jesus. (Pl's Ex. 1 at 10149.) When asked for the owner's last name, the driver said, "I can't pronounce it." (Pl's Ex. 1 at 10169.) Trooper Salas then asked, "what does it sound like," to which the driver responded, "I don't know." When asked again if he knew the owner's full name, the driver responded, "that's all I remember is Jesus." (Tr. at 12; Pl's Ex. 1 at 10182.)

Trooper Salas then asked a series of questions in order to obtain the driver's personal information. The driver identified himself as Kenny Slater of Dennison, Iowa. (Pl's Ex. 1 at 10192.) Slater indicated that he was coming from Los Angeles, heading to Dennison, Iowa, and that he had been on vacation. (Tr. at 12, 18; Pl's Ex. 1 at 10224.)

In addition to asking personal identification questions, Trooper Salas also asked Slater about his relationship to his passenger. Slater said that the passenger was "someone I picked up out there." (Pl's

Ex. 1 at 10229.) Slater said that he did not know the passenger's name and that the passenger did not speak English. (Tr. at 13.) Trooper Salas found it unusual that Slater was traveling such a long distance with the passenger but did not know the passenger's name. (Tr. at 13.) Given this information about the passenger, Trooper Salas asked Slater if he had traveled from Iowa to Los Angeles for a vacation, as he previously indicated, or if he had traveled to Los Angeles to pick up the passenger. Slater stated he had gone to Los Angeles for both reasons. (Tr. at 13.) When asked how he was able to pick up the passenger, given that the passenger did not speak English, Slater stated that he was given directions to an address in Los Angeles where he was to pick up the passenger. (Tr. at 13.)

Trooper Salas asked dispatch to run a driver's license check and provided Slater's name, date of birth, and the issuing state of Iowa. (Pl's Ex. 1 at 10290.) In addition, because Slater did not know the full name of the registered owner, Trooper Salas also ran a vehicle check on the pickup truck. (Tr. at 13; Pl's Ex. 1 at 10282.) Trooper Salas was required to wait approximately ten minutes for a response from dispatch.[3] When dispatch ultimately responded, it was unable to locate a valid driver's license for Kenny Slater. (Tr. at 13.) The vehicle check indicated that the pickup truck was not reported stolen. (Tr. at 13.)

During the time dispatch was running the requested computer checks, Trooper Salas continued to obtain information from Slater in order to complete the "Warning." Trooper Salas asked for Slater's address, phone number and a physical description. (Pl's Ex. 1 at 10408.) During this conversation, Trooper Salas asked Slater if he

---

**3.** Trooper Salas requested the driver's license check at approximately 10:32 a.m. Dispatch responded at 10:41 a.m. (Pl's Ex. 1 at 10290–10656.)

was employed. Slater responded that he was not, and that he had not been employed for over a year. (Tr. at 14; Pl's Ex. 1 at 10555.) Slater then said that he detailed cars with his brother and had traveled to Los Angeles to visit some detailing shops. Trooper Salas found Slater's information suspicious given that Slater initially stated he was in Los Angeles on vacation, then he later stated he had gone to Los Angeles to pick up the passenger, and he was now indicating that he had gone to visit some detail shops. Accordingly, Trooper Salas inquired further, asking what detail shops Slater had visited. Slater could not provide Trooper Salas with any names. Rather, Slater said he had visited some detail shops on a street named Century. (Tr. at 14.)

Trooper Salas testified that he remained confused as to how Slater came into contact with his passenger, and so he asked Slater about the directions he obtained in order to pick up his passenger. Slater stated that he did not have written directions, but had called his brother-in-law and his brother-in-law had given him directions to a Super 8 Motel where the passenger was located. (Tr. at 15.) Because Slater had stated that the pickup truck belonged to his brother-in-law, Trooper Salas then asked Slater for the brother-in-law's phone number. Slater stated that he did not know the phone number. Slater then said that he had not called anyone for directions, rather someone else had called him. (Tr. at 16.)

During this conversation Trooper Salas learned that Slater departed Iowa on Wednesday, arrived in Los Angeles on Friday afternoon, spent all day Saturday in Los Angeles and departed Los Angeles to return to Iowa on Sunday night. (Pl's Ex. 1 at 10792–10825.) Slater told Trooper Salas that he had stayed in the motel with the passenger during the two nights he spent in Los Angeles.

Slater told Trooper Salas that the passenger was moving to Iowa. When Trooper Salas asked where the passenger's luggage and clothing were, Slater stated that the passenger did not have any. Slater claimed ownership of the bag located in the bed of the pickup truck. Trooper Salas found it unusual that the passenger was moving from Los Angeles to Iowa and yet had no bag, luggage or clothing. (Tr. at 16.) Slater acknowledged, "I know everything sounds a little strange, but that's how it is." (Pl's Ex. 1 at 10914.)

Trooper Salas testified that during this interaction Slater appeared "very nervous, more nervous than others in a similar traffic stop situation." (Tr. at 15.) Salas testified that "[Slater] continued to swallow hard, open his mouth, [and] it appeared as though he was searching for moisture in his mouth." (Tr. at 15.) Slater told Trooper Salas that his mouth was dry. (Tr. at 15.)

Trooper Salas handed Slater a copy of the "Warning" and the vehicle registration. He then asked Slater if he could approach the passenger and ask him a few questions while Slater remained in the patrol car. Slater responded, "go ahead." (Tr. at 17; Pl's Ex. 1 at 11180.)

After approaching the pickup, Trooper Salas asked the passenger, in Spanish, where he was going.[4] The passenger responded, "Iowa." (Tr. at 18.) When asked

---

4. Trooper Salas does not speak fluent Spanish, but speaks enough Spanish to communicate some questions and answers. (Tr. at 18.) Moreover, Trooper Salas had reason to believe the passenger understood some English. For example, when Trooper Salas approached the vehicle he asked, in English, if the pickup had been traveling with the vehicle that had been following behind them. In response, Silos looked out the window and said, no. (Pl's Ex. 1.)

specifically where in Iowa, the passenger indicated "Council Bluffs." (Tr. at 18.) In a combination of broken English and broken Spanish, Trooper Salas asked the passenger for his name. The passenger provided an identification card with the name Octavio Rojas Silos. Trooper Salas asked the passenger if he knew the driver's name. The passenger responded with a name which sounded like "Nick." Trooper Salas testified that he was not sure whether the passenger actually said the name Nick, but Trooper Salas was certain that the name provided by the passenger did not sound like Kenny. (Tr. at 19.)

While speaking with the passenger, Trooper Salas noticed a new cell phone in the center console of the pickup truck. Trooper Salas asked the passenger if the cell phone belonged to him. The passenger said it did not. (Tr. at 19.) Given the passenger's denial of ownership, Trooper Salas assumed the phone must have belonged to Slater. (Tr. at 20.)

Trooper Salas returned to his patrol car and asked Slater if he knew the phone number to the cell phone he observed in the center console of the pickup truck. (Pl's Ex. 1 at 11377.) Slater stated that the cell phone belonged to the passenger. (Pl's Ex. 1 at 11379.) When Trooper Salas told Slater that the passenger denied ownership of the phone, Slater said, "I don't know, it ain't my phone." (Pl's Ex. 1 at 11383.) Trooper Salas found this response suspicions. Trooper Salas testified that in his training and experience, drug organizations often provide a cell phone to a person who is hauling narcotics. According to Salas, the cell phone is provided so that the organization can check on the driver as they are traveling across the country. In Trooper Salas' experience, the driver or carrier may not know the cell phone number because the phone does not belong to him. (Tr. at 20.)

At that point, Trooper Salas asked Slater if there was anything illegal in the vehicle. (Tr. at 20; Pl's Ex. 1 at 11395.) Slater stated there was not. (Tr. at 21.) Trooper Salas asked specifically if there was any "marijuana, cocaine, heroin, methamphetamine in the vehicle." (Tr. at 21.) Slater indicated "not to his knowledge." (Tr. at 21.)

Trooper Salas then asked, "is it okay with you if I search that vehicle?" Slater said, "yeah." (Pl's Ex. 1 at 11419.) Trooper Salas asked again, "that's okay with you?" Slater responded, "What am I going to tell you, no? Yeah, you can." Salas confirmed, "so it's okay with you?" Slater clearly stated, for a third time, "yeah." (Pl's Ex. 1 at 11435.) Trooper Salas asked Slater to exit the patrol car and stand approximately 20 yards ahead, in front of the vehicle, on the shoulder of the interstate. (Tr. at 21.)

Trooper Salas approached the passenger, who remained sitting in the pickup truck. Trooper Salas asked, in Spanish, if there was any "marijuana, cocaine, heroin or methamphetamine in the vehicle." The passenger said there was not. (Tr. at 21; Pl's Ex. 1 at 11490.) Trooper Salas then asked the passenger, in English, if he could search the vehicle. (Tr. at 21.) Trooper Salas testified that "[the passenger] agreed to that, based on his actions." (Tr. at 21.) According to Trooper Salas, the passenger was shaking his head in a "yes" manner, and looking around the vehicle. The passenger then exited the vehicle. (Tr. at 21; Pl's Ex. 1 at 11498.)

Trooper Salas began searching the passenger compartment. He removed the air bag cover to check the compartment behind the cover and observed an air bag that had previously deployed. According to Trooper Salas, it appeared as though rather than replacing the deployed air bag someone had simply pushed the air bag

back into the compartment and then secured the cover with dry wall screws. (Tr. at 24.) Trooper Salas then exited the passenger compartment and went to the tailgate of the vehicle. During the course of the traffic stop, Trooper Salas had observed that the tailgate was secured with a rubber strap and string with some grease or petroleum coming from the bottom. Trooper Salas noted that the tailgate configuration combined with the petroleum was "very suspicious." (Pl's Ex. 1 at 11521.) Trooper Salas lowered the tailgate and looked inside. Within the tailgate, Trooper Salas observed a package wrapped in plastic or cellophane. The package was field tested and was determined to contain methamphetamine. (Tr. at 25–26.)

The defendants, Slater and Silos, have filed a motion to suppress the evidence in this case. As grounds for their motion, the defendants contend: (1) that they were unlawfully detained; and (2) that the search of the vehicle was conducted without consent or probable cause.

### DISCUSSION

#### A. The Stop and Detention

■■■■ A routine traffic stop is a seizure within the meaning of the Fourth Amendment. *United States v. Botero–Ospina,* 71 F.3d 783, 786 (10th Cir.1995), *cert. denied,* 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996). The reasonableness of such a stop is reviewed under a two-part test set forth in *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under that test, the court must make a dual inquiry asking first whether the officer's action was justified at its inception, based on an observed traffic violation or a reasonable articulable suspicion by the officer that a traffic violation or equipment violation has occurred or is occurring. *Botero–Ospina,* 71 F.3d at 787. Second, a court must determine whether the detention

"was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. 1868; *United States v. Williams,* 271 F.3d 1262, 1266 (10th Cir. 2001), *cert. denied,* 535 U.S. 1019, 122 S.Ct. 1610, 152 L.Ed.2d 624 (2002).

The defendants do not challenge Trooper Salas' initial stop of the vehicle for a cracked windshield and two improper lane changes. *See* Def. Slater's Mem. In Support at 6 ("Defendant does not here dispute Officer Salas' initial justification for the stop."); Def. Silos' Mem. In Support at 3–4 (arguing exclusively that Trooper Salas did not have a lawful basis for searching the vehicle). Accordingly, only the second prong of *Terry*-whether the officer's actions were reasonably related in scope to circumstances which justified the stop-is in question.

■■■■ The Supreme Court has made clear that "an investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Id.* It is the government's burden to demonstrate that the scope of the detention was legitimate. *See United States v. Melendez–Garcia,* 28 F.3d 1046, 1053 (10th Cir.1994).

Defendant Slater claims that his detention was unlawful for the following reasons. First, Slater claims that Trooper Salas exceeded the permissible duration of the detention by questioning Slater in a manner that unreasonably extended the time necessary to issue the citation. Second, Slater claims that Trooper Salas ex-

ceeded the permissible scope of the detention by asking detailed questions about his travel plans that were not justified by the purpose for the stop. Third, Slater claims that he was unlawfully detained when Trooper Salas continued to hold him in the patrol vehicle after issuing the citation.

After careful review of the applicable law and facts in this case, the court concludes that Trooper Salas' detention of the defendants was reasonable in light of the totality of the circumstances. More specifically, although Trooper Salas' investigation of the defendants began with the observed cracked windshield and lane violations, the court finds that Trooper Salas was confronted almost immediately with additional factors which justified the continued detention and investigation beyond the traffic violation based on an objectively reasonable suspicion of illegal activity.

■ It is well established that "an officer conducting a routine traffic stop may run computer checks on the driver's license, the vehicle registration papers, and on whether the driver has any outstanding warrants or the vehicle has been reported stolen." *United States v. Mendez*, 118 F.3d 1426, 1429 (10th Cir.1997). "The officer may detain the driver and his vehicle as long as reasonably necessary to make these determinations and to issue a citation or warning." *United States v. Wood*, 106 F.3d 942, 945 (10th Cir.1997); *United States v. Martinez*, 983 F.2d 968, 974 (10th Cir.1992), *cert. denied*, 507 U.S. 1056, 113 S.Ct. 1959, 123 L.Ed.2d 662 (1993). However, once the computer checks confirm that the driver has produced a valid license and proof of entitlement to operate the car, the driver must be permitted to proceed on his way, without further delay by police for additional questioning. *United States v. Anderson*, 114 F.3d 1059, 1063–64 (10th Cir.1997).

■ In this case, upon first contact with the vehicle, Trooper Salas was presented with a driver who was unable to produce evidence that he was legally permitted to operate the vehicle. When asked to provide a driver's license, Slater stated that he did not have a driver's license or any other identification with him. Similarly, the passenger, Silos, provided only an identification card and did not provide a valid driver's license. In addition, Trooper Salas had reason to be concerned about the ownership of the vehicle as the registration showed that the vehicle was owned by a third party. Although Slater claimed that the third-party owner was his brother-in-law, Jesus, Slater did not know and was unable to provide a full name for the registered owner. These circumstances alone justified a limited detention while Trooper Salas had dispatch run computer checks on the driver's license, the vehicle registration papers, and on whether the vehicle had been reported stolen. *See Mendez*, 118 F.3d at 1429. The evidence indicates that the computer checks by dispatch took approximately ten minutes; not an unreasonable amount of time given the circumstances.

While Trooper Salas was waiting for dispatch to respond with the requested information he engaged in casual conversation with Slater. Some of the conversation related to personal identification matters which were required in order to issue the "Warning." Other conversation focused on Slater's passenger, their relationship to each other, their travel plans as well as related questions that developed during their conversation on those topics.

The Tenth Circuit has not set forth a definitive list of particular questions that an officer may ask during an investigative detention. However, the questions asked by Trooper Salas in this case, i.e., the identity of the occupants, how long they had known each other, and their travel plans, were similar to questions that have

been deemed appropriate in prior cases. *See, e.g., United States v. Williams,* 271 F.3d 1262, 1267 (10th Cir.2001) (providing that the Tenth Circuit has "repeatedly held (as have other circuits) that questions· relating to a driver's plans ordinarily fall within the scope of a traffic stop"), *cert. denied,* 535 U.S. 1019, 122 S.Ct. 1610, 152 L.Ed.2d 624 (2002); *United States v. Hernandez,* 93 F.3d 1493, 1499 (10th Cir.1996) (stating that questions about travel plans are routine and "may be asked as a matter of course without exceeding the proper scope of a traffic stop"). Similarly, Trooper Salas' questions concerning Slater's employment were part of a "casual conversation" that evolved from a general discussion of travel plans and arose after Slater provided inconsistent and unusual reasons for his trip to Los Angeles. As such, the questioning was not unlawful. *See United States v. Wood,* 106 F.3d 942, 944 (10th Cir.1997) (where district court findings provided that officer specifically asked "what kind of work [motorist] did," *United States v. Wood,* 915 F.Supp. 1126, 1132 (D.Kan.1996), *rev'd* 106 F.3d 942 (10th Cir.1997), appellate court characterized a conversation about travel plans, employment and rental car rate as permissible "casual conversation").

Moreover, courts draw a distinction between questioning that prolongs the detention and questioning that does not. *United States v. Oliver,* 363 F.3d 1061, 1066 (10th Cir.2004). "Questions that do not increase the length of detention (or that extend it by only a brief time) do not make the custody itself unreasonable or require suppression of evidence found as a result of the answers." *Id.* at 1067 (quoting *United States· v. Childs,* 277 F.3d 947, 949 (7th Cir.2002)). Finally, the court finds it significant that it was the defendant's own conduct-failing to provide a valid license and his inability to provide the name of the registered owner-which necessitated the more extensive questioning and length-. ened the amount of time required by dispatch to run the permissible computer checks.

■ Having concluded that Trooper Salas' questioning of Slater was not unlawful, the court further notes that Slater's responses to Trooper Salas' legitimate questions did not allay his concerns, but rather increased them. "Officers properly investigating one offense are not required to ignore suspicious circumstances suggesting the commission of other kinds of offenses." *United States v. Galindo–Gonzales,* 142 F.3d 1217, 1222 (10th Cir.1998); *United States v. Espinosa,* 782 F.2d 888, 891 (10th Cir.1986) (providing that police officers need not close their eyes to suspicious circumstances). "An investigative detention may be expanded beyond its original purpose ... if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Villa–Chaparro,* 115 F.3d 797, 801–02 (10th Cir.), *cert. denied,* 522 U.S. 926, 118 S.Ct. 326, 139 L.Ed.2d 252 (1997).

The standard for evaluating whether an officer could have had a reasonable suspicion of illegal activity is an objective one. *See id.* at 802. The determination of reasonable suspicion may be based on both facts known upon making the stop, and those learned during the course of the stop. *United States v. Oliver,* 363 F.3d 1061, 1067 (10th Cir.2004). Whether the subsequent detention is supported by reasonable suspicion of illegal activity does not depend upon any one factor but on the totality of the circumstances. *United States v. Jones,* 44 F.3d 860, 872 (10th Cir.1995); *United States v. Soto,* 988 F.2d 1548, 1555 (10th Cir.1993). By definition, the totality of the circumstances includes

all circumstances known to the officer at the time, as well as reasonable inferences and conclusions that may be drawn by the officer. In determining reasonableness, the officer's conduct should be viewed with " 'common sense' considering 'ordinary human experience.' " *Villa–Chaparro*, 115 F.3d at 801 (quoting *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). After careful review of the totality of the circumstances in this case, the court concludes that Trooper Salas had reasonable suspicion to detain the defendants while he conducted an investigation beyond the traffic citation.

■ Trooper Salas began observing suspicious and unusual circumstances immediately after stopping the vehicle. As explained more fully above, neither defendant had a license valid for the operation of the vehicle on the public highway. Although Slater claimed he had a valid license in Iowa, a records check was unable verify his claim. Defendant Silos produced only an identification card. *See United States v. Garcia*, 52 F.Supp.2d 1239, 1250–51 (D.Kan.1999) (providing that in context of a traffic stop, driving without a valid license may support a finding of reasonable suspicion); *Hunnicutt*, 135 F.3d at 1349 n. 1 (suggesting that in context of a traffic stop, driving on a suspended license is a factor supporting reasonable suspicion). Additionally, the vehicle registration was in the name of a third party. The inability on the part of either Slater or Silos to provide proof of ownership or authority to have the vehicle, combined with the inability to even name the registered owner provided reasonable suspicion to detain the defendants to determine whether they were in lawful possession of the vehicle. *See Hunnicutt*, 135 F.3d at 1349 ("In particular, the inability to offer proof of ownership or authorization to operate the vehicle has figured prominently in many of our cases upholding further questioning.").

The defendants' inconsistent and unusual travel plans also contributed to reasonable suspicion of illegal activity, as did the unusual relationship between Slater and Silos. *See id.* (providing that inconsistent statements about travel plans may justify further questioning). Slater initially said he was in Los Angeles on vacation. Later he said he went to Los Angeles to pick up the passenger. Slater stated that he did not know the passenger's name, and that the passenger did not speak English. When the conversation revealed that Slater was unemployed, Slater then stated that he had gone to Los Angeles to visit auto detailing shops. However, Slater was unable to identify any of the detailing businesses he had visited. The stories of their destination also differed. Slater stated that they were headed to Dennison, Iowa. Silos said they were headed to Council Bluffs, Iowa.

Moreover, Trooper Salas testified that he had suspicion of illegal drug activity based on several observations about the vehicle. For example, during his initial contact with Slater and Silos, Trooper Salas observed that the passenger-side air bag compartment appeared to have been tampered with and was secured with dry wall screws. Trooper Salas also observed a single clothing bag for the two occupants who were traveling cross country.

Trooper Salas' observation of a new cell phone in the center console of the vehicle also contributed to his reasonable suspicion of illegal drug activity. Trooper Salas asked each defendant separately about the phone. Both defendants denied ownership of the phone and both denied knowledge of the phone number. Trooper Salas testified that these unusual facts surrounding the cell phone were consistent with drug trafficking. Salas testified that in his experience, drug dealers often provide a phone to couriers so they can be monitored

while traveling across the country. Trooper Salas also testified that in his experience, the couriers often do not know the number to the phone because it does not belong to them.

Finally, Trooper Salas observed that Slater was extremely nervous throughout the encounter-more nervous than the typical motoring public. While recognizing that "[n]ervousness alone cannot support reasonable suspicion of criminal activity," *United States v. Salzano,* 158 F.3d 1107, 1113 (10th Cir.1998), Slater's nervousness in this case exceeded that of the average citizen during a routine traffic stop and contributed to Trooper Salas' reasonable suspicion of criminal activity. *See United States v. Williams,* 271 F.3d 1262, 1269 (10th Cir.2001), *cert. denied,* 535 U.S. 1019, 122 S.Ct. 1610, 152 L.Ed.2d 624 (2002); *Soto,* 988 F.2d at 1556 & n. 4 (providing that extreme nervousness, when combined with other factors, can be a basis for reasonable suspicion).

Based on the totality of the circumstances, the court concludes that Trooper Salas had the reasonable suspicion necessary to continue to detain the defendants in order to investigate possible criminal activity.

### B. *Consent to Search the Vehicle*

Having concluded that the defendants were not being illegally detained, the court must consider whether the defendants' consent to search the vehicle was freely and voluntarily given. *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). A search conducted pursuant to consent is an exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Whether an individual freely and voluntarily gave consent is a question of fact and is determined from the totality of the circumstances. *United States v.*

*Pena,* 143 F.3d 1363, 1366 (10th Cir.), *cert. denied,* 525 U.S. 903, 119 S.Ct. 236, 142 L.Ed.2d 194 (1998).

The government has the burden of proving valid consent. *Id.; United States v. Cody,* 7 F.3d 1523, 1526 (10th Cir.1993). First, "it must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'" *Pena,* 143 F.3d at 1366 (quoting *United States v. Angulo–Fernandez,* 53 F.3d 1177, 1180 (10th Cir.1995)). Second, the government must show that the police did not coerce the individual into granting consent. *See id.*

With regard to the first step of this two-part test, the evidence in this case shows that the defendants unequivocally and specifically consented to the search of the vehicle. The testimony from the hearing as well as the video recording of the incident both demonstrate that Slater and Silos understood Trooper Salas' request to search and both provided a affirmative responses. More specifically, Slater was asked three separate times for permission to search the vehicle, and each time he responded, unequivocally, "yeah." (Pl's Ex. 1 at 11419–11435.)

Turning to the second part of the two-step test-whether the consent was free from coercion-the court finds that the government has satisfied its burden of proving that Trooper Salas did not coerce the defendants into granting consent. In determining whether consent was free from coercion,

a court should consider, inter alia, physical mistreatment, use of violence, promises or inducements, deception or trickery, and the physical or mental condition and capacity of the defendant within the totality of the circumstances.

*Pena,* 143 F.3d at 1367 (quoting *United States v. McCurdy,* 40 F.3d 1111, 1119

(10th Cir.1994)). There is no evidence in this case that Trooper Salas used inappropriate means to obtain consent. Trooper Salas was the only officer at the scene, and his request for consent and the search that followed were conducted along a public highway during daylight hours. There was no evidence that he mistreated the defendants, or that he used force or coercion or any other inappropriate tactics. Therefore, the court concludes that the defendants freely and voluntarily consented to the search of the vehicle.

Therefore, based on the foregoing and good cause appearing, IT IS HEREBY ORDERED that defendants' motion to suppress is DENIED.