**UNITED STATES of America, Plaintiff,**

v.

**Robert WISNIEWSKI and Eddy Gamez, Defendants.**

**No. 2:03–CR–00390 DB.**

United States District Court, D. Utah, Central Division.

Feb. 24, 2005.

Henri R. Sisneros, Utah Federal Defender Office, Salt Lake City, UT, for defendants.

Veda M. Travis, U.S. Attorney's Office, for plaintiff.

## MEMORANDUM OPINION AND ORDER

BENSON, District Judge.

### INTRODUCTION

Before the Court is Defendants' motion to suppress evidence seized after a vehicle search at a traffic stop. Defendant Robert Wisniewski ("Wisniewski") argues that he was illegally detained when pulled over by a Utah Highway Patrolman, and that the illegal detention rendered his consent to search the vehicle invalid. Defendant Eddy Gamez ("Gamez"), as the registered owner of the vehicle Wisniewski was driving, has joined in the motion. The government contends that neither defendant has standing to assert any Fourth Amendment rights in this case; but if standing is found, the government argues the detention was justified by reasonable suspicion. In the alternative, the government asserts that the *Carroll* doctrine applies, and the search was justified, even without consent, based on probable cause. The Court heard testimony at several hearings,[1] received briefing from the parties, and heard final oral arguments on January 19, 2005. After reviewing all the factual material presented in light of the relevant law, the Court DENIES Defendants' motion to suppress for the reasons set forth below.

### BACKGROUND

#### I. The Traffic Stop

On May 22, 2003, Sergeant Paul Mangelson ("Sgt.Mangelson") of the Utah Highway Patrol was conversing with another trooper while monitoring traffic on

---

1. Evidentiary hearings were held in this motion on August 7, 2003, August 12, 2003, October 23, 2003, and July 20, 2004.

Interstate 15 just south of Nephi, Utah. The two officers had parked their vehicles facing south in a crossover[2] and were using radar to detect the speed of vehicles headed in both directions. (Transcript of Hearing, August 7 and 12, 2003 ("Tr.I") at 12–13).

At approximately 9:30 a.m., Sgt. Mangelson observed a black pickup truck headed northbound. According to the reading on the radar detector, the truck was traveling at 63 miles per hour, well below the posted 75 mile per hour speed limit. (*Id.* at 13). As the truck passed him, Sgt. Mangelson noticed that the driver did not look toward the officers but rather was "glued to the steering wheel." (*Id.*). This observation, combined with the slow speed and the early morning hour, led Sgt. Mangelson to believe the driver may be impaired by fatigue or perhaps otherwise; he decided to follow the pickup truck to more closely observe the driver and his driving. (*Id.* at 14).

While Sgt. Mangelson followed, he watched as the vehicle crossed the lane divider on the right-hand side of the Interstate several times.[3] Sgt. Mangelson then moved his vehicle to the inside lane and pulled alongside the black pickup truck. He noticed the driver in the same position as he had observed before—glued to the steering wheel—and it appeared that the driver "was in a trance." (*Id.*). Given his experience in patrolling Interstate 15, Sgt. Mangelson feared the driver may be overly tired, or perhaps even asleep, from driving all night and decided to pull him over to see if he was too fatigued or otherwise impaired to be safely operating a vehicle. (*Id.*).

After pulling over the vehicle, Sgt. Mangelson approached the black pickup truck on the passenger side and requested from Wisniewski, the sole occupant, his license and the vehicle's registration. (*Id.* at 15–16). As he took the documents, Sgt. Mangelson noticed that Wisniewski's hand was trembling. (*Id.* at 15). The Indiana driver's license confirmed that the driver was Wisniewski, but the vehicle, also registered in Indiana, was not registered in Wisniewski's name. (*Id.* at 15–16) When asked who owned the truck, Wisniewski replied that an individual named Eddy was the owner. Sgt. Mangelson did not remember what last name Wisniewski used, but he is certain it wasn't Gamez. According to the vehicle's registration, the owner of the vehicle was named Eddy Gamez. (*Id.* at 16–17).

Because Wisniewski was not the registered owner, Sgt. Mangelson asked him how he got the truck. Wisniewski responded that Eddy was a friend and had loaned him the truck. (*Id.* at 18–19). Sgt. Mangelson next asked Wisniewski where he had been. (*Id.* at 26). Wisniewski explained that he had been in Las Vegas looking for work. After further questioning, Wisniewski claimed that he was experienced in the construction trade—buildings as opposed to roads—and was searching for construction work in Las Vegas. (*Id.* at 26, 28) Sgt. Mangelson felt Wisniewski's explanation was somewhat spurious, particularly because Wisniewski's hands were smooth, not rough and calloused as one would expect of a construction worker. (*Id.* at 28–29). Sgt. Mangelson also observed that Wisniewski was having trouble speaking because his

2. Interstate 15 in this area has an unimproved median between northbound and southbound lanes. A crossover is a portion of the median that is leveled or improved to allow snowplows and emergency vehicles to cross over between the southbound lanes and the northbound lanes when necessary. (Tr. I at 42).

3. The Defendants do not contest that it is against the law in Utah to cross over a lane divider. This is sometimes referred to as "weaving." (Tr. I at 15).

mouth was so dry. To Sgt. Mangelson, Wisniewski appeared "scared to death"; he had to constantly lick his lips in order to speak. Sgt. Mangelson also testified that he could actually see Wisniewski's stomach "churning." (*Id.* at 25).

During this conversation with Wisniewski, Sgt. Mangelson also noticed several things about the cab of the pickup truck. First, he noticed a strong perfume odor that apparently was from an air freshener. (*Id.* at 21, 23). He also saw a cell phone, a road atlas, and a radar detector. (*Id.*). Finally, Sgt. Mangelson noticed that there was very little luggage and there were no visible construction tools in the cab of the truck, but he was unable to see if luggage or tools were in the truck bed because it was covered. (*Id.* at 21, 24, 75–76).

Given all of his observations—the strong perfume odor, the extreme nervousness of Wisniewski, the apparently inconsistent stories about his whereabouts, the presence of certain items and the lack of others, and the registration being in the name of a third party—and his extensive training as both a highway patrol trooper and drug interdiction specialist, Sgt. Mangelson suspected that Wisniewski was involved in transporting contraband. Following up on the initial reason for making the traffic stop, he asked Wisniewski to step out of the pickup truck to perform some field sobriety tests. (*Id.* at 31). Those tests indicated that Wisniewski "had a little bit of nystagmus," most likely from fatigue, but he did not appear to be intoxicated or otherwise physically impaired. After the sobriety tests were performed, Sgt. Mangelson was satisfied that Wisniewski was physically able to operate a vehicle. (*Id.* at 31–32).

II. Detention and Consent to Search the Vehicle

At that point, Sgt. Mangelson escorted Wisniewski back to his patrol car. (*Id.* at 32). He performed a quick pat down search for weapons on Wisniewski and then sat him in the patrol car while Sgt. Mangelson verified some information, such as whether Wisniewski's driver's license was current and whether the vehicle had been reported stolen. (*Id.*). While in the patrol car, Wisniewski still appeared to be extremely nervous and never made eye contact with Sgt. Mangelson. He volunteered that he had been arrested for D.U.I. on five separate occasions, but otherwise said very little. (*Id.* at 32–33). Finally, the dispatcher reported to Sgt. Mangelson that Wisniewski had no criminal history (there was no record that he had ever been arrested on D.U.I charges), that his driver's license was current, and that the vehicle had not been reported stolen. (*Id.* at 33).

At some point before the dispatcher's report, Sgt. Mangelson returned to Wisniewski his driver's license and the vehicle registration certificate. (*Id.*) When Wisniewski heard the dispatcher, he asked Sgt. Mangelson if he was free to go. Sgt. Mangelson said no. He explained that he believed Wisniewski was transporting drugs and wanted to search the pickup truck. (*Id.*) Wisniewski denied transporting drugs but said to "go ahead" and search the vehicle. In asking for consent to search, Sgt. Mangelson did not raise his voice, threaten Wisniewski, move closer to him, point a finger, or touch Wisniewski. Sgt. Mangelson was the only law enforcement officer present when this exchange took place. (*Id.* at 34–35).

After Wisniewski consented to a search of his vehicle, Sgt. Mangelson had him step out of and stand away from the patrol car. As they exited the vehicle, Trooper Kelsey arrived. (*Id.* at 35). Sgt. Mangelson explained to Trooper Kelsey what had transpired and that he believed there were drugs in the pickup truck. The two offi-

cers began a search of the truck. (*Id.*) Wisniewski did not limit their search in any way. (*Id.* at 36). When they opened the tailgate, they saw a duffle bag and could see within the bag· the outline of what appeared to be a brick shaped material. Further search uncovered four duffle bags and a suitcase that contained 134 bricks, weighing approximately one kilogram each, of cocaine. (*Id.* at 35–36).

### III. Eddy Gamez

Wisniewski was arrested for transporting narcotics and taken to the Juab County correctional facility. (*Id.* at 36, 123). Sergeant John Ellis ("Sgt.Ellis") of the Utah Department of Public Safety was called to interview Wisniewski.[4] (*Id.* at 123). According to his testimony, after Wisniewski waived his Miranda rights, Sgt. Ellis asked about the owner of the black pickup truck. Wisniewski stated that the owner was a friend of his whom he had known for a short while, and the two·of them had exchanged vehicles. (*Id.* at 123–25). He stated further that he had made this same trip to Las Vegas several times before, each time to obtain approximately 130 kilograms of cocaine[5], but on those other occasions he used his own vehicle. (*Id.* at 125; Transcript of Hearing, October 23, 2003, ("Tr.II.") at 174). When pressed, Wisniewski said that he did not know the owner's name, did not know him very well, and did not know anything about the owner. (Tr. I at 124–25).

In support of his effort to establish standing in this matter, Wisniewski testified before the Court on August 12, 2003, at the initial evidentiary hearing.[6] Wisniewski stated that he had known Gamez for two to three years but was unable to correctly pronounce Gamez's name to Sgt. Mangelson because he did not speak Spanish very well. (*Id.* at 132). According to Wisniewski, the two met initially on a "construction site" where Wisniewski was helping his brother with a remodeling project in East Chicago, Indiana. (*Id.* at 132, 135–138). Prior to that time, Wisniewski had been employed as a truck driver and operated heavy equipment for construction companies.[7] (*Id.* at 131). Wisniewski's brother had known Gamez and had initially introduced them. From there, the two developed somewhat of a social relationship, attending "cookouts" at Wisniewski's brother's home, going to motocross events together, and riding motorcycles together and with Wisniewski's family.[8] (*Id.* at 133–34). Although Gamez lived in California, Wisniewski testified that Gamez came to Indiana approximately once a month or once every two months to visit his in-laws.[9] (*Id.* at 142).

With respect to Gamez's pickup truck, Wisniewski testified that he asked Gamez if he could borrow his truck two or three

---

**4.** *Sgt. Ellis testified before the Court on August 12, 2003.*

**5.** The purpose of these trips—to transport cocaine—was testified to by Agent Hicken after having reviewed Sgt. Ellis' report of the interview with Wisniewski.

**6.** The hearing held on August 12, 2003, was a continuation of the initial evidentiary hearing which began on August 7, 2003.

**7.** At the remodeling project where he initially met Gamez, Wisniewski was hired for painting and plumbing services rather than to drive dump trucks or heavy equipment. Wisniewski testified that Gamez also visited other job sites where Wisniewski was working after the two first became acquainted.

**8.** Wisniewski testified that he and Gamez had attended motocross events or rode motorcycles together in Indiana, Michigan and California.

**9.** Wisniewski stated that he had never met Gamez's in-laws, nor had he ever met Gamez's wife and children.

days prior to his departure. This was the first time Wisniewski had ever asked to borrow Gamez's truck. (*Id.* at 134). Wisniewski stated that he didn't use his own truck for this trip because it did not get good gas mileage. (*Id.* at 143–44). He also stated that he was not aware Gamez's truck had three hidden compartments. (*Id.*) Knowing that he was planning a cross-country trip, Gamez allowed Wisniewski to take the truck and placed no limitations on his use of the truck. According to Wisniewski, this conversation took place at Wisniewski's home in Indiana. (*Id.* at 134). At the time of the first hearing, Wisniewski did not offer any evidence that Gamez knew about the drug smuggling operation. At that time, Gamez was not a defendant.

After the hearing on August 12, 2003, the government located Gamez in Monrovia, California using the registration and other documents found in the truck. (Tr. II at 169–70). On September 15, 2003, Craig Hicken ("Agent Hicken") of the Utah Department of Public Safety and Special Agent Terry Lacorse of the United States Drug Enforcement Agency traveled to California and contacted Gamez at his home.[10] (*Id.* at 170). During an interview with Gamez, Gamez confirmed he became acquainted with Wisniewski approximately four years earlier and had a social relationship with him, attending motocross events together in both Indiana and California. (*Id.* at 180–82). Gamez also stated that he was not the owner of the black pickup truck but rather he had purchased it for a friend, named Socio, who lived in Indiana. According to Gamez, although the title was in his name, Socio had possession of the truck and the title. (*Id.* at 170–71). Gamez told Agent Hicken that when Wisniewski contacted him about borrowing the truck, he told Wisniewski that the truck did not belong to him, and that Wisniewski

would have to contact Socio to arrange to use the vehicle. Gamez gave Wisniewski a telephone number for Socio and then claimed to have called Socio to vouch for Wisniewski, but he did not know whether Wisniewski later contacted Socio himself. (*Id.* at 171–72)

Gamez stated to Agent Hicken that if he had known Wisniewski was going to use the pickup truck to transport drugs, he never would have vouched for him. He also stated that he had not been in contact with Wisniewski since their initial discussion about borrowing the truck. (*Id.* at 172–73). Agent Hicken later contacted the Juab County Sheriff's impound lot where the pickup truck was being held and learned that there had been no inquiries into the vehicle by either Gamez or Socio. (*Id.* at 173–74)

At the hearing held on October 23, 2003, Wisniewski presented a recorded telephone conversation between Gamez and Wisniewski's counsel, which occurred the day prior to the hearing. (*Id.* at 202). In that recording, Gamez stated that he met Wisniewski and his wife about four years earlier in "Chicago," and that he had seen them two or three times annually since then. According to Gamez, he and Wisniewski had borrowed each other's vehicles on previous occasions. As to the black pickup truck, Gamez stated that he purchased the truck for a friend, Socio, in Chicago; the truck was stored at Socio's home, who also possessed the title and the keys, but Gamez could use it whenever he was visiting. Although he did not technically own the vehicle, Gamez stated that the vehicle was registered in his name, that he payed to insure the vehicle, and that he "basically" had authority to loan the vehicle to others. *See* Pla's Mem. Supp. Mot. Suppress ("Plaintiff's Memo") at (Ex. 1, February 13, 2004).

**10.** Agent Hicken testified before the Court at an evidentiary hearing on October 23, 2003.

During the telephone conversation, Gamez confirmed that he gave Wisniewski permission to use the black pickup truck to look for work—although he didn't know where Wisniewski was going to look for work—and that this was the first time Wisniewski had asked to use "that vehicle." He stated that he had arranged for Wisniewski to call Socio and pick up the truck at an address in Whiting, the same address found on the registration certificate. (*Id.*)

After further investigation, the government found Gamez's fingerprints on the cocaine seized on May 22, 2003. Gamez was thereafter named in a superceding indictment, filed on December 30, 2003, as a co-defendant in this case. On February 10, 2004, Gamez declared in a written declaration that he was the registered owner of the pickup truck, that he paid for the truck, and that he pays for insurance and registration fees on the truck. (Plaintiff's Memo at Ex. 2). Gamez also stated in his declaration that Wisniewski had approached him in early May, 2003, to ask for permission to borrow the truck, to which Gamez agreed. (*Id.*) Wisniewski presented Gamez's written declaration to the Court in support of his claim that he has standing to contest the search of the vehicle. (Transcript of Hearing, July 20, 2004 ("Tr.III") at 5).

On July 20, 2004, Gamez appeared at an evidentiary hearing to give testimony and be cross-examined on his written declaration. (*Id.* at 10). On cross-examination, Gamez testified that he had purchased the black pickup truck from a dealership in East Chicago sometime in late 2002. The reason he gave for purchasing the truck in Indiana rather than California where he resided was that he was looking to begin a business in Indiana. (*Id.* at 12–13). Gamez further testified that he stored the truck in Whiting, Indiana, at the home of Socio, although he could not give Socio's

full name or telephone number. (*Id.* at 14). When Wisniewski called him to borrow the truck, Gamez testified that he gave permission and instructed Wisniewski to go to Socio's home where Socio would deliver the keys. (*Id.* at 14, 17). He then called Socio and instructed him to give Wisniewski the keys to the truck. (*Id.* at 18). He also testified that he told Wisniewski no one else could use the truck or be in the truck. (*Id.* at 12).

Gamez also stated in testimony that, at the time Wisniewski called to ask to use the truck, he thought Wisniewski was using the truck to look for work; he did not know Wisniewski was going to use the truck for transporting drugs. (*Id.* at 19–20). However, later in the same hearing, Gamez stated just the opposite, testifying that the drugs Wisniewski was carrying belonged to Gamez, and that he had called Wisniewski while in transit and asked Wisniewski if he would pick up the drugs in California and transport them as a favor. (*Id.* at 20). He further testified that Wisniewski drove the truck to California where both of them loaded the cocaine into the truck. After the truck was loaded, Gamez told Wisniewski not to allow anyone in the vehicle for any reason. (*Id.* at 21, 23–24). Gamez also admitted that he had lied to Agent Hicken about the ownership of the truck and whether he or Socio gave permission to use the truck for the transportation of drugs, because he was "scared and just wanted to get away from any problems." (*Id.* at 24–25).

In the present motion, both Wisniewski and Gamez ask the Court to suppress the cocaine found in the truck because it was obtained pursuant to an unlawful search of the truck and seizure of the evidence.

## FINDINGS OF FACT

Pursuant to Fed.R.Crim.P. 12(d), the Court makes the following findings of fact

based on the background as set forth above:

1. On May 22, 2003, Sgt. Mangelson pulled over a black pickup truck, driven by Wisniewski, on I–15 based on his observation of the truck weaving in and out of the lane of travel, and his suspicion that the driver was intoxicated or otherwise impaired.

2. In conversation with Sgt. Mangelson, Wisniewski exhibited several signs of extreme nervousness: Wisniewski's hands were trembling, his mouth was so dry as to make it difficult to speak, and his stomach was visibly churning. Overall, Wisniewski appeared to be extremely frightened.

3. Wisniewski produced a valid Indiana driver's license.

4. Gamez was the registered owner of the black pickup truck, which was registered in Indiana.

5. Wisniewski received permission from Gamez to use the truck, and there were no meaningful limitations placed upon Wisniewski's use of the truck. When Wisniewski was pulled over, he was operating the truck within the scope of the permission he was given.

6. Upon questioning from Sgt. Mangelson, Wisniewski stated that he had been to Las Vegas to look for construction work.

7. There was a strong perfume odor emanating from the cab of the vehicle.

8. There was a cell phone, road atlas, and radar detector in the cab of the vehicle.

9. There was a conspicuous lack of luggage in the cab of the vehicle.

10. There was a conspicuous lack of construction tools in the cab of the vehicle.

11. Sgt. Mangelson could not ascertain the contents of the truck bed because it was covered.

12. Upon request from Sgt. Mangelson, Wisniewski exited his vehicle to perform some field sobriety tests.

13. The results of the sobriety tests indicated that Wisniewski, although perhaps fatigued, was not impaired to the point where he would be physically incapable of safely operating a motor vehicle.

14. Sgt. Mangelson escorted Wisniewski to his patrol car and, before entering the patrol car, Sgt. Mangelson performed a brief pat down search of Wisniewski to check for weapons. After the pat down search, both individuals got in the patrol car.

15. The purpose of entering the patrol car was to allow Sgt. Mangelson to run a computer check of Wisniewski's license and the vehicle's registration.

16. While seated in the car, Wisniewski continued to show signs of extreme nervousness, never making eye contact with Sgt. Mangelson.

17. While waiting for dispatch to report, Sgt. Mangelson returned to Wisniewski his driver's license and the vehicle's registration certificate.

18. While waiting for the information, Wisniewski volunteered that he had been arrested five times on D.U.I. charges.

19. The dispatcher reported that Wisniewski's license was valid and current, that he had no criminal record, and that the vehicle registered to Gamez had not been reported stolen.

20. Upon hearing the information, Wisniewski asked if he was free to leave. Sgt. Mangelson said he was not free to leave.

21. Sgt. Mangelson told Wisniewski that he thought Wisniewski was transporting drugs. Wisniewski denied transporting drugs.

22. Sgt. Mangelson said he wanted to search Wisniewski's vehicle. Wisniewski said he could go ahead and search.

23. In asking to search the vehicle, Sgt. Mangelson did not raise his voice, threaten Wisniewski, move closer to him, point a finger at him, or touch him in any way.

24. Sgt. Mangelson was the only law enforcement officer present when his conversation with Wisniewski in the patrol car took place.

25. Sgt. Mangelson asked Wisniewski to exit the patrol car and stand off to the side of the patrol car.

26. As Sgt. Mangelson and Wisniewski exited the patrol car, Trooper Kelsey arrived.

27. Sgt. Mangelson informed Trooper Kelsey of all that had transpired, including that Wisniewski had given consent to search the vehicle.

28. The two officers searched the vehicle. Wisniewski did not ask them to stop or limit their search in any way.

29. In the truck bed, the two officers saw a duffle bag which had an outline of a brick shaped substance.

30. In searching further, the two officers found 134 bricks of cocaine, each weighing one kilogram, dispersed among four duffle bags and one suitcase in the truck bed.

31. Wisniewski was immediately arrested and later charged with drug trafficking.

32. Further analysis of the cocaine and its containers revealed Gamez's fingerprints.

33. Gamez was the owner of the cocaine or had sufficient control over the cocaine to constitute ownership.

34. Gamez was later charged as a codefendant with Wisniewski in the same drug trafficking case.

CONCLUSIONS OF LAW

1. Wisneiwski has standing to challenge the search of Gamez's vehicle because he was in lawful possession and control of the vehicle at the time of the search, having received permission to use the vehicle from Gamez.

2. Gamez has standing to challenge the search of his vehicle because he is the registered owner of the vehicle.

3. Gamez has standing to challenge the seizure of 134 kilograms of cocaine from his vehicle because he was the owner or sufficiently in control of the cocaine.

4. Sgt. Mangelson had reasonable suspicion that Wisniewski was involved in criminal activity sufficient to lawfully and reasonably continue Wisniewski's detention.

5. Sgt. Mangelson did not have probable cause to believe the black pickup truck contained contraband. Therefore, the automobile exception to the warrant requirement did not justify his warrantless search of the vehicle.

ANALYSIS

I. Standing

The Fourth Amendment guarantees to each citizen the right to be free from unreasonable searches and seizures by any governmental agency. U.S. CONST. amend. IV. This right is a personal right that cannot be vicariously asserted. *United States v. Allen*, 235 F.3d 482, 489 (10th Cir.2000) (citing *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Nicholson*, 144 F.3d 632, 636 (10th Cir.1998)). The threshold question in any Fourth Amendment analysis is whether the claimant has standing under the circumstances to assert his own right. "The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating

that his own rights were violated by the challenged search." *Allen*, 235 F.3d at 489 (citations and quotations omitted).

■ The "classic" test to determine whether a Fourth Amendment right exists is two-fold: "[1] whether the defendant manifested a subjective expectation of privacy in the area searched and [2] whether society is prepared to recognize that expectation as objectively reasonable." *Id.* (quoting *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir.1989)).

### A. Wisniewski's Standing

■ Where the defendant is not the owner of the vehicle he is driving, he must show that he had "a legitimate possessory interest in or [a] lawful control over the car" before he may challenge a search of the vehicle. *United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir.) (quoting *Allen*, 235 F.3d at 489). Because the defendant's expectation need only be reasonable, he need not provide legal documentation or other concrete evidence to establish the legitimacy of his possession. *Hocker*, 333 F.3d at 1209. However, something more than mere possession of the vehicle and its keys is required. *Id.* The defendant must show, at a minimum, "that he gained possession from the owner or someone with authority to grant possession." *Id.* (quoting *United States v. Arango*, 912 F.2d 441, 445 (10th Cir.1990)).

■ The Tenth Circuit has outlined three factors that, although not determinative, are important in guiding a district court. when resolving issues of standing relative to vehicle searches: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in

the vehicle." *Hocker*, 333 F.3d at 1209 (quoting *Allen*, 235 F.3d at 489).

Although Wisniewski did not assert ownership over the cocaine seized from the pickup truck he was driving, he did testify regarding his possession of the vehicle. *See Hocker*, 333 F.3d at 1209. Wisniewski testified that he received permission from the owner, a friend of his, to use the black pickup truck to look for work. Because Wisniewski claimed that he personally obtained permission to use the pickup truck from the registered owner, he "plainly ha[d] a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle." *Id.* (quoting *United States v. Rubio–Rivera*, 917 F.2d 1271, 1275 (10th Cir.1990)).

The government would have the Court disregard both Wisniewski and Gamez's testimony in their entirety due to inconsistencies throughout each and when compared to one another. "At a hearing on a motion to suppress, the district judge assesses the credibility of the witnesses and determines the weight to be given to the evidence." *United States v. Taverna*, 348 F.3d 873, 877 (10th Cir.2003) (citing *United States v. Caro*, 248 F.3d 1240, 1243 (10th Cir.2001)). It is the prerogative of the Court, as the finder of fact, to believe all, part or none of the testimony presented by any witness at a suppression hearing. *See Hall v. United States*, 418 F.2d 1230, 1231 (10th Cir.1969).

The Court acknowledges that the testimony of both Defendants contains inconsistencies and is unreliable in some instances. However, while other portions of Defendants' testimony may be implausible, the Court is satisfied that Wisniewski has proven by a preponderance of the evidence that he received permission from Gamez to use his truck. Nowhere in the testimony of either Defendant is there any indication that permission was not granted, or that

Wisniewski was operating the truck beyond any limitations dictated by Gamez. Furthermore, the government offers no evidence to refute the fact that permission was granted. *See United States v. Garcia,* 897 F.2d 1413, 1418 (7th Cir.1990) (defendant had standing in spite of car being reported stolen and being unable to recall owner's last name because government failed to prove by a preponderance of the evidence that the car was being used without permission of the owner). The Court believes the defendants on this point, despite the existence of other testimonial discrepancies and prevarications.

Wisniewski also presented evidence other than his own testimony at the suppression hearing supporting his legitimate possession of the vehicle, which fulfills the third factor outlined by the Tenth Circuit. Wisniewski presented Gamez's declaration to the Court in which Gamez stated that he had loaned the truck to Wisniewski. In a conversation with Wisniewski's attorney, Gamez again stated that he authorized Wisniewski to use his truck. Gamez later appeared in court to be cross-examined about his declaration and he again reiterated that Wisniewski was lawfully in possession of his truck. All of this supports what Wisniewski initially stated to Sgt. Mangelson: that he had permission from the owner to use the truck.

Viewing all of the evidence presented, the Court finds by a preponderance of the evidence that Wisniewski received permission from Gamez to borrow his truck, and Wisniewski was reasonable in believing that Gamez was the owner or otherwise had authority to allow him to use the truck. Having received permission from the proper authority, Wisniewski has standing to contest the search of the vehicle.

## B. *Gamez's Standing*

■ It is well settled that an owner of a vehicle manifests a subjective expectation of privacy in his car and that society considers that expectation objectively reasonable. Therefore, an owner of a vehicle always has standing to contest the search of his vehicle. *See United States v. DeLuca,* 269 F.3d 1128, 1145 (10th Cir.2001) ("owner has standing to directly challenge the illegal search of the vehicle"). The question in this case is whether Gamez was in fact the owner of the vehicle.

The government again urges the Court to disregard the entire body of testimony provided by Gamez in this case due to his lack of credibility and therefore argues that Gamez has provided no proof of ownership. Although, as the government correctly points out, Gamez himself gave conflicting testimony regarding the ownership of the truck, the Court need not rely solely on his testimony to determine ownership. The registration in Gamez's name is sufficient evidence to prove that the truck belonged to him. There is also unrefuted evidence that Gamez paid for the truck and continues to pay to insure it. It is true that Gamez originally denied actual ownership, claiming he was a strawman purchaser for an illegal alien who would have been unable to purchase the truck himself. However, that conflicting testimony does not erase his name from the registration document.

Gamez also testified that the cocaine found in the truck was his and he therefore has standing to contest its seizure. The government would again have the Court disregard Gamez's testimony on this subject, citing the improbable nature of his story regarding how he came to possess such a large and valuable amount of cocaine. However, the critical question as it relates to standing is not whether the background details as to actual ownership are true, but rather whether Gamez had a

possessory interest in the cocaine. The Court finds from the evidence that Gamez was the owner of the cocaine or at least had permission to possess it from its actual owner. He therefore has standing to contest the seizure of the cocaine.

Because the Court finds that Gamez has standing, he is entitled to argue the search violated his own personal rights. Gamez relies entirely on Wisniewski's arguments in this motion to suppress—i.e. if the officer's conduct violated Wisniewski's Fourth Amendment rights, it also violated those of Gamez. Therefore, the substantive analysis below that pertains to Wisniewski is also applicable to Gamez.

11. In briefing and at oral arguments, Defendants did not raise any challenge to voluntariness of Wisniewski's consent. They argue only that there was insufficient reasonable suspicion to continue Wisniewski's detention.

The following exchange occurred during oral arguments on the motion to suppress, held on January 19, 2005, between the Court and Wisniewski's counsel, Mr. Sisneros:

The Court: Well, let me see if I have your argument straight then. You assert and admit and concede that the Court needs to first agree with your argument that there was not a sufficient basis for holding Mr. Wisniewski any longer after the original traffic investigation was over?

Mr. Sisneros: That is accurate. The case that we rely on is the McSwain case.

The Court: And if I disagree with you on that, then you have no argument that consent was involuntary?

Mr. Sisneros: I don't want to concede the argument. I think that that is certainly a much weaker argument than relying on the illegal detention.

The Court: I am just trying to understand if you are even making it, not the weakness or strength of it. Are you even arguing voluntary consent? If there was sufficient reasonable suspicion to continue to detain him for a little while longer to pursue the investigation, under those facts are you arguing that there was involuntary consent?

Mr. Sisneros: My appellate unit would probably chastise me for this, but I don't think so.

The Court: Okay.

## II. Reasonable Suspicion

Defendants next argue that Sgt. Mangelson did not have reasonable suspicion to further detain Wisniewski once his suspicions of impairment were dissipated. According to Defendants, Wisniewski's extended detention was not based on reasonable suspicion, and Sgt. Mangelson had no right to ask Wisniewski for consent to search the vehicle. Defendants do not challenge the voluntariness of the consent; their position is limited to the argument that Sgt. Mangelson had an insufficient basis to even ask for permission to search the vehicle.[11]

Mr. Sisneros: I think if the Court should conclude that the officer was reasonable under these circumstances in detaining him further for whatever criminal activity which we don't really know, then while coercive it was not sufficiently coercive.

The Court: So under those circumstances the comment, you're not free to leave, becomes academic. It is irrelevant to the question of whether it was okay to go ahead and ask him if he could search the truck. You have him properly detained and he says, am I free to leave? Of course you have to say, no, you are not free to leave.

Mr. Sisneros: He [the officer] is just giving a truthful statement. It is not unfairly coercive, it is fairly coercive. The officer had concluded that he is a suspect in some criminal activity

Transcript of Hearing, January 19, 2005, at 41–42. *See also United States v. Doyle*, 129 F.3d 1372, 1377 n. 1 (10th Cir.1997) ("Because we hold that [the officer's] detention of Mr. Doyle was lawful, we do not address his claim that his consent to search and the evidence subsequently obtained should be suppressed as the fruits of an unlawful detention."); *United States v. Mendez*, 118 F.3d 1426, 1432 (10th Cir.1997) (defendant's contention that his consent was involuntary was entirely dependant on argument that he gave consent during illegal detention).

Stopping a vehicle and detaining its occupants is a seizure and must be analyzed under the reasonableness inquiries of the Fourth Amendment. *United States v. Walker*, 933 F.2d 812, 815 (10th Cir.1991). However, because a normal traffic stop is akin to an investigative detention, it is analyzed under the principles pertaining to investigative detentions announced in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See United States v. Dewitt*, 946 F.2d 1497, 1501 (10th Cir. 1991).

Applying *Terry*, a traffic stop is reasonable under the Fourth Amendment if "the officer's actions were justified at its inception, [and if the stop] was reasonably related in scope to the circumstances which justified the [stop] in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. 1868. Here, there is no question that Sgt. Mangelson was justified in initially stopping Wisniewski because he felt Wisniewski may be impaired and he had observed a traffic violation. The issue in this case concerns the second prong of the *Terry* analysis—that is, whether the scope of the stop was reasonably related to Wisniewski's apparent impairment and observed traffic violation. "The investigative stop usually must 'last no longer than is necessary to effectuate the purpose of the stop,' and '[t]he scope of the detention must be carefully tailored to its underlying justification.'" *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir.1998) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

■ An officer may detain someone longer than is reasonably related to the underlying justification of the stop in two situations: 1) when the officer "has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring," and 2) when the "initial detention becomes a consensual encounter." *Hunnicutt*, 135 F.3d at 1349; *see also*,

*United States v. Villa–Chaparro*, 115 F.3d 797, 801 (10th Cir.1997) ("An investigative detention may be expanded beyond its original purpose ... if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity" (quotations omitted)). The government asserts, as is its burden to do, *see United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998), that Sgt. Mangelson observed several factors and made reasonable inferences from those observations which caused him to reasonably suspect Wisniewski was involved in criminal conduct. Armed with reasonable suspicion, the government contends Sgt. Mangelson lawfully detained Wisniewski beyond the scope of the original traffic stop.

Reasonable suspicion is determined by examining the alleged factors within "the totality of the circumstances." *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir.1994). The Court should not try to "pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious." *Mendez*, 118 F.3d at 1431. Factors, which by themselves are consistent with innocent behavior, may support a finding a reasonable suspicion when taken together. *See Untied States v. Arvizu*, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2001); *United States v. Solokow*, 490 U.S. 1, 9–10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). On the other hand, "[a]lthough the nature of the totality of the circumstances makes it possible for individually innocuous factors to add up to reasonable suspicion, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *Salzano*, 158 F.3d at 1114–15 (citations and quotations omitted).

In evaluating the factors which purportedly gave rise to reasonable suspicion, a court must be careful to "judge the offi-

cer's conduct in light of common sense and ordinary human experience ... [but also] grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances". *Mendez*, 118 F.3d at 1431 (citing *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir.1996)).

■ Sgt. Mangelson's detention of Wisniewski can be viewed as occurring in three stages: 1) from the initial stop to the conclusion of the field sobriety tests, 2) from the conclusion of the sobriety tests to the moment when dispatch reported its findings on Wisniewski and the vehicle, and 3) from the dispatcher's report to Wisniewski's consent. Defendants do not dispute that Sgt. Mangelson had a right to detain Wisniewski during Stage 1.[12] As Wisniewski passed the officer initially, he was "glued to the steering wheel" and, upon further investigation, appeared to be in a trance. Those observations combined with Wisniewski violating the law by weaving, and the time of day, reasonably led Sgt. Mangelson to suspect that Wisniewski was intoxicated or otherwise impaired. This reasonable suspicion justified Stage 1 of the detention. "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." *Taverna*, 348 F.3d at 877; *Fernandez*, 18 F.3d at 878.

■ Although Wisniewski mildly contends that he was illegally detained from the moment he passed the field sobriety tests through Stage 2, that is clearly not the case. First, Sgt. Mangelson had not yet run a computer check on Wisniewski's license and registration, nor decided whether to issue a citation for weaving. He was entitled to verify this information based upon the justification underlying the initial stop even if doing so took some time. *See, United States v. Jones*, 44 F.3d 860, 872 (10th Cir.1995) (detention for 30 minutes was reasonable because the officer was waiting the entire time for a response from dispatch regarding the status of the defendant's license).

Additionally, even if the purpose of the initial stop ceased once the sobriety tests were complete, Wisniewski was driving a car that was registered to someone else who's name he could not pronounce. Under those circumstances, Sgt. Mangelson could have reasonably suspected the vehicle was stolen and was entitled to pursue that suspicion. *See Villa–Chaparro*, 115 F.3d at 802 (where defendant was not the registered owner of the vehicle, did not stop promptly when signaled to do so, and possessed suspicious materials in the car, "the possibility existed that defendant had stolen the vehicle, was transporting narcotics, or both," and the officer was justified in running a check on the vehicle). The

12. Wisniewski does question whether Sgt. Mangelson still could have reasonably suspected he was intoxicated or impaired after seeing how nervous and apparently alert he was when Sgt. Mangelson asked for his license and registration, relying on *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994). *McSwain* is inapplicable here because in that case, the reason for the stop—expired license plate on the vehicle—no longer existed when the officer approached the vehicle and saw the license plate was current. Here, there were two reasons for the initial stop: to verify whether Wisniewski was physically capable of driving and to potentially cite him for weaving. First, the Court does not believe that Sgt. Mangelson was satisfied nor should have been satisfied as to Wisniewski's impairment after speaking with him in the vehicle. But even if Sgt. Mangelson determined from his first words with Wisniewski that Wisniewski was not impaired, he still was allowed to verify Wisniewski's license and the car's registration, to cite him for weaving, and to ascertain whether there were reports that the vehicle was stolen.

Stage 2 detention was therefore justified by reasonable suspicion.

■ Regarding Stage 3, Defendants contend Sgt. Mangelson did not have reasonable suspicion to continue to detain Wisniewski. The government contends otherwise, arguing that Sgt. Mangelson developed reasonable suspicion at some point before dispatch reported that Wisniewski had a valid and current license and that the vehicle had not been reported stolen.

The government points to several factors which it claims support Sgt. Mangelson's reasonable suspicion that Wisniewski was transporting contraband: 1) Wisniewski's extreme nervousness and its physical manifestations, 2) the vehicle was registered to an individual not present in the truck, 3) Wisniewski did not know, or could not pronounce the registered owner's last name, 4) the "very strong" perfume smell emanating from the cab, 5) the presence of a cell phone, road atlas, and radar detector in the cab, 6) the lack of luggage in the cab, 7) the apparent improbability and inconsistency of Wisniewski's explanation regarding his travel plans, 8) the fact that Wisniewski was traveling on a known drug pipeline from a known source city, and 9) related to factor number 1, the fact that Wisniewski's nervousness did not subside once the detention was extended. The Court addresses these factors below and finds that Sgt. Mangelson's suspicion that Wisniewski was transporting drugs was objectively reasonable, thus supporting further detention.

### A. Extreme Nervousness

Sgt. Mangelson stated that Wisniewski was extremely nervous when pulled over as evidenced by his trembling hands, his unusually dry mouth, his "scared to death" appearance, and his churning stomach. Moreover, Sgt. Mangelson noticed that once the field sobriety tests were complete and Wisniewski was seated in the patrol waiting for the dispatcher's report, he continued to exhibit nervousness by not making eye contact. The Court also notes that Wisniewski lied about being arrested five times on charges of D.U.I. during that period, which may have been an effect of the nervousness. Sgt. Mangelson testified that, unlike a routine traffic stop, Wisniewski's nervousness increased as the encounter continued.

Nervousness can be of limited significance and must be approached with caution in determining whether reasonable suspicion exists. *See United States v. Wald,* 216 F.3d 1222, 1227 (10th Cir.2000); *United States v. Wood,* 106 F.3d 942, 948 (10th Cir.1997), *Salzano,* 158 F.3d at 1113; *Fernandez,* 18 F.3d at 879. However, "extreme and continued nervousness . . . 'is entitled to somewhat more weight.' " *United States v. Williams,* 271 F.3d 1262, 1268–69 (10th Cir.2001) (quoting *United States v. West,* 219 F.3d 1171, 1179 (10th Cir.2000)).

This case presents circumstances analogous to those in *Williams* and *West.* In those cases, the Tenth Circuit upheld findings of reasonable suspicion that were supported by the officer's observation of extreme and continued nervousness. Here, Wisniewski's hands were trembling—"shaking real bad"—he had difficulty speaking because his mouth was so dry, his stomach was visibly churning, and his facial expression betrayed that he was "scared to death." While those initial observations may not be sufficient to support reasonable suspicion, the fact that Wisniewski's nervousness continued, even intensified, makes his nervousness more of a factor in the totality of the circumstances. Sgt. Mangelson testified, and the Court finds, that Wisniewski's nervousness exceeded that of an average citizen during a

routine traffic stop both in intensity and duration.

The Court finds that Wisniewski's display resembles that of the defendants in *Williams* (trembling hands, shaky voice, and twitching lip that did not dissipate throughout the entire stop) and *West* (continued display of nervousness beyond what a normal citizen with nothing to hide would display). As such, the Court cannot "ignore [Wisniewski's] nervousness in reviewing the totality of the circumstances," *Williams*, 271 F.3d at 1269, and "it is entitled to somewhat more weight because of [its] extreme and continued [nature]." *West*, 219 F.3d at 1179.

## B.  Third–Party Vehicle

A vehicle without the presence of its registered owner is termed a third-party vehicle by law enforcement officers. "One recurring factor supporting a finding of reasonable suspicion ... is the inability of a defendant to provide proof that he is entitled to operate the vehicle he is driving." *Villa–Chaparro*, 115 F.3d at 802 (quoting *United States v. Gonzalez–Lerma*, 14 F.3d 1479, 1484 (10th Cir.1994)). "A defining characteristic of [the Tenth Circuit's] traffic stop jurisprudence is the defendant's lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle in question, thus giving rise to objectively reasonable suspicion that the vehicle may be stolen." *Fernandez* 18 F.3d at 879. The fact that the vehicle is not registered in the driver's name, combined with other factors, engenders "the possibility ... that a[d]efendant ha[s] stolen the vehicle, [is] transporting narcotics, or both." *Villa–Chaparro*, 115 F.3d at 802; *see also Hunnicutt*, 135 F.3d at 1349 ("the inability to offer proof of ownership or authorization to operate the vehicle ... figure[s] prominently" in a reasonable suspicion analysis).

The fact that Wisneiwski was not the registered owner of the black pickup truck clearly weighs heavily in favor of Sgt. Mangelson's reasonable suspicion. As stated above, he clearly was reasonable in suspecting the car was stolen. That Wisneiwski could not properly pronounce the name on the registration strengthened the suspicion that the vehicle was stolen and only enhanced its reasonableness. Sgt. Mangelson also testified that, in his experience and training, it is common for drug couriers to employ third-party vehicles to transport their drugs. *See Williams*, 271 F.3d at 1270. When combined with other factors, his suspicion was reasonably enlarged to include the transport of contraband.

## C.  Odor from Air Freshener

"[T]he scent of air freshener is properly considered as a factor in the probable cause analysis." *West*, 219 F.3d at 1178–79 (citing *United States v. Anderson*, 114 F.3d 1059, 1066 (10th Cir.1997); *United States v. Leos–Quijada*, 107 F.3d 786, 795 (10th Cir.1995); *United States v. Alvarez*, 68 F.3d 1242, 1246 (10th Cir.1995) (McKay, concurring)). This is because air fresheners are often used by drug couriers to mask the distinctive odor of controlled substances. *West*, 219 F.3d at 1179. Even a "scent of air freshener," when combined with other factors can support reasonable suspicion. *Anderson*, 114 F.3d at 1066.

Sgt. Mangelson testified that the perfume odor emanating from the pickup truck was obvious and "very strong." When viewed in light of his other suspicious observations about the vehicle, Sgt. Mangelson was reasonable in attributing more significance to the air freshener scent. *See also United States v. Sanchez–Valderuten*, 11 F.3d 985, 989 (10th Cir.

1993); *United States v. Stone*, 866 F.2d 359, 362 (10th Cir.1989).

### D. Travel Plans

"[C]ontradictory or implausible travel plans can contribute to a reasonable suspicion of illegal activity." *Mendez*, 118 F.3d at 1431 (citations omitted). Similarly, "inconsistencies in the information provided to the officer during the traffic stop may give rise to reasonable suspicion." *Wood*, 106 F.3d at 947.

Wisniewski claimed that he had traveled from Indiana to Las Vegas in search of construction work. Sgt. Mangelson found this explanation contradictory to what he observed about Wisniewski, specifically that his hands did not look like the hands of a construction worker. *See United States v. Turner*, 928 F.2d 956, 959 (10th Cir.1991) (officer had reasonable suspicion where defendant claimed to be a mechanic but his hands were well-manicured and did not appear to be those of a mechanic).[13] Although standing alone, this factor would likely not be sufficient to support a finding of reasonable suspicion, when viewed in the totality of the circumstances, the Court finds that it adds to the reasonableness of Sgt. Mangelson's suspicion.

Wisniewski would have the Court recognize the reasonable explanation for why his hands were not calloused and rough—that being that he drove trucks and operated mechanical equipment on construction sites rather than performing actual construction work with his hands—as rendering this factor innocent. However, reasonableness should be determined from the facts the officer knew, not the facts he could have discovered had he asked more pointed and searching questions. That being said, it would not be unreasonable to expect even the hands of a construction site truck driver to show some wear and tear, especially one who is devoted enough to his profession to drive half-way across the country in search of work.

### E. Cell Phone, Road Atlas, and Radar Detector

In *Wald*, where the officer observed a road atlas in the vehicle, the Tenth Circuit held that " '[t]he presence of open maps in the passenger compartment . . . is entirely consistent with innocent travel such that, in the absence of contradictory information, it cannot reasonably be said to give rise to suspicion of criminal activity.' " 216 F.3d at 1227 (quoting *Wood*, 106 F.3d at 947). In today's world, the presence of cell phones and, to a lesser extent, radar detectors are likely as prevalent among travelers as road maps. Therefore, observation of these items, standing alone, should rarely support a finding of reasonable suspicion. *But see, United States v. Criollo–Casteneda*, 89 Fed.Appx. 173, 176 (10th Cir.2004) (questionable persuasive value of pen cap without a pen, used napkins without surrounding fast food wrappers, and cell phone, although reasonable suspicion upheld when combined with strong mint odor and state of defendant's eyes). In this case, however, these observations were not standing alone; they were observed by a trained police officer in conjunction with a number of other suspicious factors. As such, the presence of a

---

**13.** The court in *Turner* seemed to rely more on the officer's observations due to the officer's previous experience as a mechanic. However, the Court does not feel that, for example, only officers with prior experience in construction work can be believed when it comes to examining and commenting on the appearance of an alleged construction worker. The overriding concept in determining reasonable suspicion is reasonableness "in light of common sense and ordinary human experience." The Court finds that it was reasonable for Sgt. Mangelson, whatever his prior experience, to expect a construction worker's hands to show some signs of his trade.

cell phone, road atlas, and radar detector in Wisniewski's vehicle reasonably contributed to some degree to Sgt. Mangelson's reasonable suspicion.

### F. Lack of Luggage

Reasonable suspicion is sometimes bolstered by the officer's observation that there is very little luggage in the automobile given the stated purpose of the trip. *See Jones*, 44 F.3d at 872 (lack of luggage for an alleged two week trip); *Arango*, 912 F.2d at 447 (inadequate amounts of luggage in truck for two week vacation); *United States v. Espinosa*, 782 F.2d 888, 891 (10th Cir.1986) (very little luggage where defendant claimed to be on vacation). However, if the amount of luggage is reasonably consistent with the defendant's itinerary, that factor should not be suspicious. *See Wald*, 216 F.3d at 1227 (two pieces of luggage for two people on a purported weekend road trip to Las Vegas is not at all suspicious); *Mendez*, 118 F.3d at 1431 (lack of luggage meant little where vehicle had a trunk, "a location in which many, if not most, travelers store luggage.") [14]

Sgt. Mangelson admitted that, although there was no luggage in the passenger seat, he could not see into the truck bed where luggage may have been because it was covered. Consistent with *Mendez*, that fact should not have reasonably raised suspicions unless Wisniewski's travel plans would have dictated luggage should be in the cab. Wisniewski, who hailed from Indiana, claimed to be coming from Las Vegas where he had been looking for work. Although he never mentioned the length of time he stayed in Las Vegas, it would be reasonable to assume that the trip would have lasted several days. First, the drive from and back to Indiana would take a day or two each way, allowing time for meals and rest. Next, someone who is serious enough about his profession to spend a few days in transit to a destination where a potential job awaits is likely to spend several days at that destination examining all of the prospects.

After accounting for the duration of the trip, the lack of luggage in the passenger compartment of the pickup truck likely added little to Sgt. Mangelson's suspicion. The Court recognizes that the bed of a pickup truck certainly is sufficiently spacious to transport one individual's luggage for a trip lasting several days. It is also likely that most travelers who travel in pickup trucks prefer to transport their luggage in the truck bed. As was stated in *Mendez*, the lack of luggage in [that] case [was] "so innocuous and so susceptible to varying interpretations that [it carried] little or no weight" in the determination of reasonable suspicion. *Id*. Here again, however, even though the lack of apparent luggage is entitled to little weight, it is entitled to some weight.

### G. Traveling on "Drug Pipeline" from known "Source City"

"Standing alone, a vehicle that hails from a purported known drug source area is, at best, a weak factor in finding suspicion for criminal activity," *Williams*, 271 F.3d at 1270, particularly if "the government offer[s] no evidence to support the assertion that vehicles coming from [the particular source area] are any more likely to contain drugs than those coming from [any other area]." *Salzano*, 158 F.3d at 1114. However, "answers to questions suggesting an individual is concealing the fact that he [was coming from] a known drug source area can 'give rise to suspi-

---

**14.** The *Mendez* court noted that it "might view a lack of luggage in a vehicle's passenger compartment much differently if the driver claimed to be making a lengthy trip and the vehicle did not have a trunk." 118 F.3d at 1431 n. 3.

cion.'" *Williams*, 271 F.3d at 1270 (quoting *Wood*, 106 F.3d at 947). *But see Jones*, 44 F.3d at 863, 872 (fact that defendants were traveling to and from cities both known for high drug usage contributed to finding of reasonable suspicion even where defendants made no attempt to conceal this fact); *Espinosa*, 782 F.2d at 890–91 (same).

There is no evidence before the Court to suggest that Wisniewski attempted to conceal the fact that he was coming from Las Vegas, nor did he give inconsistent accounts of the destinations on his trip. Likewise, there was nothing about the vehicle, such as a license plate or registration form differing states, to suggest that he was being untruthful about where he was traveling to and from. Regardless of whether he was ultimately truthful or not in his account, "[s]o long as [Wisniewski] provides a consistent statement from whence he came, the mere fact that he comes from [a known source city] is not a reasonable basis to suspect that he is carrying drugs or other contraband." *Salzano*, 158 F.3d at 1114.

Likewise, traveling on a "drug corridor" cannot reasonably support a suspicion that the traveler is carrying contraband. To so hold would give law enforcement officers reasonable suspicion that every vehicle on every major—and many minor—thoroughfares throughout this country was transporting drugs. The presence of these factors in this case are, at best, weak support to the other factors that establish reasonable suspicion.

### H. Totality of the Circumstances

Judging these several factors under the totality of the circumstances, the Court concludes that Sgt. Mangelson had an objectively reasonable and articulable suspicion that Wisniewski was involved in criminal conduct. Under the circumstances, Sgt. Mangelson was justified in detaining Wisniewski through stage 3 of the detention, and was therefore justified in relying on his consent to search the vehicle.

### III. Probable Cause and the *Caroll* Doctrine

Beyond reasonable suspicion, the government argues that the vehicle search was justified on probable cause pursuant to the automobile exception to the search warrant requirement, first recognized by the United States Supreme Court in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). "Under the automobile exception, 'police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant.'" *United States v. Oliver*, 363 F.3d 1061, 1068 (10th Cir.2004) (quoting *Florida v. Meyers*, 466 U.S. 380, 381, 104 S.Ct. 1852, 80 L.Ed.2d 381 (1984) (per curiam)). Where probable cause exists, "the justification to conduct such a warrantless search does not vanish once the car has been immobilized," *Oliver*, 363 F.3d at 1068 (quoting *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam)), even though "[t]he rationale for the automobile exception is based on both the inherent mobility of cars (as it is often impracticable to obtain a warrant before a car can be driven away) and the fact that there is a reduced expectation of privacy with motor vehicles." *United States v. Mercado*, 307 F.3d 1226, 1228 (10th Cir.2002).

"The Supreme Court has stated that '[a]rticulating precisely' what 'reasonable suspicion' and 'probable cause' mean is not possible' because '[t]hey are commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* at 1230 (quoting *Ornelas v. United States*,

517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)) (quotations omitted). "In determining whether probable cause exists, an officer may draw inferences based on his own experience." *Id.* (quotations omitted).

Although the Court clearly finds that Sgt. Mangelson's possessed reasonable suspicion that Wisniewski was involved in illegal activity, it does not find the existence of probable cause to search. Sgt. Mangelson did not smell drugs in the vehicle, nor did he see any drug paraphernalia about the cab of the truck. *See United States v. Vasquez–Castillo,* 258 F.3d 1207, 1213 (10th Cir.2001) ("An officer's detection of the smell of drugs ... in a car is entitled to substantial weight in the probable cause analysis and can be an independently sufficient basis for probable cause.") (quoting *West,* 219 F.3d at 1178); *United States v. Ozbirn,* 189 F.3d 1194, 1200 (10th Cir.1999) (odor of raw marijuana, combined with nervous behavior and vague description of travel plans, satisfied probable cause standard); *United States v. Sparks,* 291 F.3d 683, 692 (10th Cir.2002) (observation of plastic baggies "of the size and type used to distribute drugs" on the front seat of the vehicle, combined with other factors, was sufficient to establish probable cause). He did not notice anything about the vehicle, such as evidence of secret compartments, that would have raised his reasonable suspicion to probable cause. *See Mercado,* 307 F.3d at 1230–31 (citing *Anderson,* 114 F.3d at 1066 (evidence of a hidden compartment—in that case an altered ceiling of the vehicle—can contribute to probable cause to search. Additionally, unusual travel plans would be insufficient, standing alone, to establish probable cause; but when combined with other factors, unusual travel plans could contribute to probable cause)). Likewise, Sgt. Mangelson did not observe anything about Wisniewski, such as him fleeing from the scene, that would have elevated his reasonable suspicion to probable cause. *See Oliver,* 363 F.3d at 1068–69 (citing *United States v. Bell,* 892 F.2d 959, 967 (10th Cir.1989) (suspicion that defendant was transporting drugs blossomed into probable cause when he fled from police detention)).

### CONCLUSION

Based upon the findings of fact and the analysis above, the Court finds that both Wisniewski and Gamez have standing to contest the legality of the vehicle search. As owner of the cocaine, Gamez also has standing to challenge its seizure. Viewing the facts surrounding Wisniewski's detention in a totality of the circumstances, the Court finds that Sgt. Mangelson possessed an objectively reasonable and articulable suspicion that Wisniewski was involved in criminal activity. Because his suspicion was objectively reasonable, Sgt. Mangelson lawfully detained Wisniewski and received Wisniewski's voluntary consent to search the vehicle. Finally, the Court finds that the automobile exception did not support a warrantless search in this instance because there was not probable cause to support such a search.

IT IS SO ORDERED.